UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-CR-20172-KMW-2

UNITED STATES OF AMERICA,

v.

SHANE HAMPTON,

    Defendant.
_____/

## ORDER GRANTING THE GOVERNMENT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF PROFESSOR DEL WRIGHT JR.

THIS MATTER is before the Court on the Government's Motion to Exclude the Expert Testimony of Professor Del Wright Jr. [DE 95]. Professor Wright concludes that a reasonable person could not know whether HYDRO, the digital asset in this case, constituted a security during the relevant period.[1] DE 95-1 at 17–18. The Court has considered the Motion, Professor Del Wright Jr.'s Report [DE 95-1], Defendant Shane Hampton's ("Defendant") Response in Opposition [DE 102], and the record. The Government does not dispute Professor Wright's qualifications. It argues that his opinions should be excluded under Rule 702 because they are not relevant and do not apply any scientific, technical, or specialized expertise. DE 95 at 1. It also seeks to preclude them as inadmissible hearsay and under Rule 403. *Id.* Professor Wright's opinion that a reasonable person would not be able to

---

[1] Professor Wright was retained to discuss (1) blockchains, digital assets, and blockchain-based entities, (2) HYDRO and Hydrogen's role in the ecosystem created to develop HYDRO, (3) cryptocurrency markets in 2018 and beyond, (4) the role of market makers and bots with respect to tradeable assets generally and cryptocurrency specifically, and (5) an individual's ability to know whether a certain cryptocurrency was a security circa 2018–2019, the alleged conspiracy period. DE 95-1 at 1–2.

determine whether HYDRO was a security improperly creates a non-existent legal element that is irrelevant to the charged conduct and in effect constitutes factual testimony that goes to Defendant's subjective knowledge as to the nature of HYDRO. Further, Professor Wright does not set out any methodology with reliable principles that is then applied to the background information and the regulatory history he provides, and as presented, the proffered opinions will not help the jury understand the evidence and may confuse it. Therefore, the Government's Motion must be GRANTED.

## I. BACKGROUND

The Indictment charges Defendant and his co-defendants with two conspiracy counts—(1) to manipulate the price of a security and (2) to commit wire fraud—and two wire fraud counts. DE 3. Defendant was the Chief of Financial Engineering at Hydrogen Technology Corporation ("Hydrogen"), a financial technology ("fintech") firm. DE 3 at 2 ¶ 3. Hydrogen operated to develop and market Application Programming Interfaces ("APIs")[2] for businesses in the financial services industry. DE 3 at 2; DE 95-1 at 5–6.

The Indictment alleges Defendant and others conspired to artificially inflate the price of Hydrogen's digital asset, HYDRO, using a "bot" that was purportedly calibrated to conduct automated "spoof"[3] orders and "wash"[4] trades. DE 3 at 6–7.

---

[2] An API is a software program that allows different applications (i.e., software programs) to communicate with each other. For example, a weather application may use an API provided by a weather service to retrieve current weather conditions and forecasts for a given location.
[3] The Indictment describes spoof orders as those placed without a legitimate intent to execute, to create a false appearance of active trading. DE 3 ¶ 13.
[4] The Indictment describes wash trades as those involving no change in beneficial ownership, because the same individual is both the buyer and the seller. DE 3 ¶ 12.

To carry out the alleged scheme, Hydrogen hired the market-making firm Moonwalkers to design and implement the bot. *Id.* at 6 ¶ 5. From June 2018 through April 2019, the scheme allegedly generated $2 million in profits from HYDRO sales at artificially inflated prices. *Id.* at 12 ¶ 17.

At trial, Defendant seeks to introduce his proposed expert witness Professor Del Wright Jr. to testify that in 2018, a reasonable person could not determine whether HYDRO constituted a security. DE 95-1 at 17. To buttress this conclusion, Professor Wright explains that HYDRO was designed to be a decentralized utility token with functionality independent of Hydrogen's API and other business endeavors. *Id.* at 18. Hydrogen intended for HYDRO to be used on an ecosystem of financial tools and applications, which included Project Hydro Protocols.[5] *Id.* at 6. Hydrogen's decentralization plan for HYDRO was an effort to broaden the HYDRO ecosystem with input from blockchain developers and materially lessen HYDRO's dependence on Hydrogen. *Id.* at 10. Hydrogen first created or "minted" HYDRO tokens in February 2018. DE 3 ¶ 14; DE 95-1 at 9. It then distributed 24% of the tokens created to software developers for free through an "airdrop"[6] in February and March 2018. DE 95-1 at 9. Professor Wright also adds that during this period, the Securities and Exchange Commission ("SEC") provided no clear guidance on whether utility tokens were securities. DE 95-1 at 18.

---

[5] The five Project Hydro Protocols that would form part of the HYDRO ecosystem were Raindrop, Snowflake, Ice, Tide, and Mist. DE 95-1 at 7–8.
[6] "Airdrop" refers to the distribution of a token for free to promote widespread interest in the token.

3

The Government opposes Professor Wright's testimony because (1) his opinions regarding whether a reasonable person could determine if HYDRO was a security are irrelevant to the disputed issues, (2) his opinions rest simply on repeating Hydrogen's statements and thus do not apply any scientific, technical or specialized expertise, and (3) his recounting of the regulatory history of cryptocurrencies during the relevant period is irrelevant and more likely to confuse the jury than aid it. DE 95 at 2.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admission of expert testimony.[7] Pursuant to Rule 702, district courts have a "gatekeeping" role to ensure that proffered expert testimony is reliable and relevant to the disputed issues. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7, 597 (1993). Accordingly, trial courts must conduct a rigorous three-part inquiry considering whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address;
(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[7] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citation omitted). The proffering party has the burden to establish these qualification, reliability, and helpfulness prongs by a preponderance of the evidence. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014).

While the Court must fulfill its role as a gatekeeper, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596. However, a defendant cannot testify by proxy through his expert. *See, e.g.*, *United States v. Tucker*, 345 F.3d 320, 330 (5th Cir. 2003).

## III. DISCUSSION

Professor Wright concludes that a reasonable person could not determine whether HYDRO was a security during the relevant period. DE 95-1 at 17–18. However, as other circuits weighing this issue have held, Defendant's or a hypothetical reasonable person's ability to know whether HYDRO constituted a security at the time of the alleged conspiracy is not relevant to the charged offenses. *See, e.g.*, *United States v. Tucker*, 345 F.3d 320, 330 (5th Cir. 2003) (adopting Ninth Circuit view that defendant's subjective belief concerning nature of instrument is irrelevant and excluding expert testimony). The Government must prove to the jury beyond a reasonable doubt that HYDRO was *in fact* a security by establishing the three *Howey* prongs.[8] *See United States v. Brown*, 578 F.2d 1280, 1284 (9th Cir.

---

[8] The three *Howey* prongs the Government must show beyond a reasonable doubt with respect to HYDRO are: (1) an investment of money, (2) a common enterprise, and (3) an expectation of profit

5

1978). Whether Defendant had specific knowledge that the object sold or offered was a security is not an issue as to the charged offenses. *Id.* Because the fraud allegations here focus on wash and spoof trading and a reasonable person's knowledge as to the nature of HYDRO is not at issue, expert testimony on what a reasonable person may believe would not assist the jury in deciding the disputed issues. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").

Underlying Professor Wright's ultimate conclusion are (1) his explanations of blockchain, decentralized applications, smart contract platforms, cryptocurrency markets, market makers, and algorithmic trading; (2) background information on Hydrogen's creation of HYDRO and the accompanying ecosystem and (3) his recitation of the regulatory history of cryptocurrencies generally. As to Professor Wright's explanations of cryptocurrency-related concepts, DE 95-1 at 2–5, Defendant argues the information would help the jury and points out that the Government does not provide reasons for excluding that portion in its entirety.[9] DE 102 at 2. However, Professor Wright's sophisticated explanations of the various technological concepts would likely cause more confusion and distract the jury from

---

from the entrepreneurial or managerial efforts of others. *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

[9] As to Professor Wright's explanation of cryptocurrency-related concepts earlier on in his Report, it appears that the Government provides a basis for precluding only one statement regarding the lack of clear guidance from the regulatory community on cryptocurrencies. DE 95-1 at 3–4 ("[N]o US regulator provided clear guidance regarding a taxonomy to determine which crypto were commodities, securities, or something else entirely. That was the case in 2018, and though the situation has improved, is still largely the case today.").

6

the facts at the heart of the case, the alleged wash and spoof trading to create a false appearance of market demand to Defendant's financial benefit.

As to the portion regarding the creation of HYDRO and the ecosystem, HYDRO initially may have been designed as a decentralized utility token with independent functionality. DE 95-1 at 18. However, expert testimony on factual issues such as HYDRO's intended use within the ecosystem and Hydrogen's decentralization plan would constitute Defendant's effort to testify by proxy.

As to Professor Wright's recitation of the regulatory history of cryptocurrencies generally, that information is not relevant, because neither Defendant's nor a reasonable person's ability to determine whether HYDRO was a security is at issue in this case. Additionally, neither his recitation of the regulatory history nor the portion of the opinion outlining the creation of HYDRO and the ecosystem applies any scientific, technical, or specialized expertise. DE 95-1 at 5–17. Those parts of the Report largely appear to mirror the public statements of Hydrogen and its employees and financial regulators, respectively. Jurors can understand these public statements without an expert's aid and such information is that which rests on fact witness testimony. *See Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen and Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995); *Medina v. 3C Const. Corp.*, 2005 WL 5960937, at *2 (S.D. Fla. Sept. 26, 2005).

While Professor Wright's sophisticated explanations of industry terms may obfuscate and distract the jury as to the relevant evidence, his opinion, including his

7

description of smart contracts with the example of a vending machine, shows that the cryptocurrency industry's vocabulary can be readily translated to simple, plain English. DE 95-1 at 2. To distill the industry terms into clear language for the jury, the parties are hereby tasked to develop a jointly stipulated list of definitions or simple explanations as to cryptocurrencies and how they function before the trial starts, which term sheet will be given to the jury. Accordingly, it is

ORDERED that:

(1) The Government's Motion to Exclude the Expert Testimony of Professor Del Wright Jr. [DE 95] is GRANTED.

(2) Prior to the trial, the parties shall submit a joint list of definitions of the key industry terms, as discussed at the January 26, 2024 Final Pretrial Conference.

DONE AND ORDERED in Miami, Florida, this 26th day of January, 2024.

PATRICIA A. SEITZ
UNITED STATES SENIOR DISTRICT JUDGE

cc: All counsel of record