UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-CR-20172-PAS

UNITED STATES OF AMERICA,

v.

SHANE HAMPTON,

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S JOINED MOTION FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

THIS MATTER is before the Court on Defendant's Joined Motion for Judgment of Acquittal and New Trial [DE 152] pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.[1]

Defendant Hampton asserts six claims. The first two challenge the jury instructions for Count One asserting—the failure to require a finding that Defendant knew HYDRO was a security [DE 152 at 3–6] and the failure to define a "security" properly [DE 152 at 6–8]. His third claim maintains a government "bait-and-switch" as to treating, as a sentencing issue, his subjective knowledge of HYDRO as a security [DE 152 at 8–12]. His fourth claim argues the exclusion of a defense instruction of honest mistake of fact was unfairly prejudicial [DE 152 at 12–14].[2] Grouped as his fifth claim are the six evidentiary rulings claimed to be unfairly prejudicial [DE 152 at 16–

---

[1] The Court granted Defendant Hampton's Motion for Leave to file a combined Fed. R. Crim. P. 29 and 33 motion due to the overlapping legal and evidentiary issues. [DE 139.]

[2] This claim relates to Defendant's argument that the jury should have considered the issue of his subjective intent given the issues raised in Defendant's third claim.

36].[3] The sixth claim is the lack of sufficient evidence to support the jury verdict [DE 152 at 35–36].

The Government's response (supplemented with exhibit cites pursuant to the Court's Order [DE 176]) maintains: (1) the evidence sufficiently proved Defendant Hampton's knowledge of the conspiracy [DE 155 at 3–5, DE 180]; (2) that the juror instructions properly informed the jury on the definition of a security and appropriately excluded any instruction of Defendant's subjective knowledge of whether HYDRO was a security [DE 155 at 3–11]; (3) that the Defendant was not entitled to his theory of defense instruction which was redundant [DE 155 at 11–13]; (4) that the Defendant was not prejudiced by the Court's legal interpretation of 15 U.S.C. § 78ff(a) and exclusion of his "affirmative defense" evidence [DE 155 at 13–16]; (5) that the Defendant was not entitled to cooperators' presentence investigation reports [DE 155 at 16–17]; and (6) the six evidentiary rulings were correct [DE 155 at 17–20].

The Court reviewed the Motion [DE 152], the Government's Response [DE 155, DE 180], Defendant's Reply [DE 158], and the record. Because the evidence was sufficient to prove Defendant's knowledge of the conspiracy and Defendant was not unfairly prejudiced by the proper jury instructions or by the Court's evidentiary rulings, Defendant's Motion must be denied.

---

[3] The asserted evidentiary errors are (1) exclusion of Defendant's expert security witness; (2) exclusion of derivative legal advice evidence regarding market makers and token decentralization plan to support inferences of good faith; (3) admission of victims' loss as a result of the market manipulation; (4) exclusion of Defendant's efforts to identify a legitimate market maker; (5) exclusion of evidence of Defendant's workload and general work responsibilities; and (6) exclusion of Agent DeFazio's supplemental cross-examination regarding Tyler Ostern's statements made during the Government's pretrial interviews.

I.   LEGAL STANDARD

Two separate legal standards govern motions for judgment of acquittal and motions for new trial. As to the former, a district court must view the evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006). However, on a motion for new trial, the court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and consider the credibility of the witnesses. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). If the court concludes that the evidence weighs sufficiently heavily against the verdict such that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury. *Id.* Motions for new trial based on a claim of improper jury instructions should only be granted if instructions, as a whole, do not correctly instruct the jury so that the Court is "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Joyner*, 899 F.3d 1199, 1203 (11th Cir. 2018).

II.  BACKGROUND

On April 20, 2023, the Government charged Defendant Hampton and his co-defendant Michael Kane with a conspiracy to manipulate the price of HYDRO, the digital asset of Defendants' company, Hydrogen Technology Corporation ("Hydrogen"), by

using an automated "bot" that conducted "spoof" orders[4] and "wash" trades.[5] [DE 3 at 1–3.] The "bot" was designed by Defendants' market-making firm, Moonwalkers, headed by co-conspirator Tyler Ostern. [*Id.* at 9.] Before Defendant Kane directed HYDRO's creation in February 2018, the Miami-based Delaware corporation provided application programming interface (API) which was a technology platform for businesses in the financial industry to assist in accessing data models for account and portfolio management. [*Id.* at 1–3; DE 57 at 2.] Initially, Hydrogen distributed HYDRO through giveaways, promotions, and employee compensation packages. [DE 57 at 5.] To raise capital for Hydrogen, the Company began selling and offering HYDRO tokens on crypto asset trading platforms in June 2018.[6] [*Id.* at 7.]

Mr. Hampton served as Hydrogen's chief of financial engineering from November 2017 through December 2022. [DE 3 at 2.] As alleged in the Indictment, Mr. Hampton engaged in the public distribution, offer, and sale of HYDRO tokens during his tenure at Hydrogen. Following a seven-day trial, on February 7, 2024, the jury found Mr. Hampton guilty of conspiracy to manipulate the price of a security in violation of 18

---

[4] The Indictment defines spoof orders as those placed without a legitimate intent to execute, to create a false appearance of active trading. [DE 3 ¶ 13].

[5] The Indictment defines wash trades as those involving no change in beneficial ownership, because the same individual is both the buyer and the seller. [DE 3 ¶ 12].

[6] According to the Defendant, the Company developed a decentralization plan to meet Hydrogen's objective of expanding the use and development of HYDRO all while trying to ensure that the token would avoid qualification as a security. DE 57 at 7. Among other things, the Company purportedly engaged in community building around the coin, encouraging decentralization ambassadors to participate in creating a collective group separate from Hydrogen and its employees. *Id.*

U.S.C. § 371 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.[7] [DE 121.] With regard to Count One, the conspiracy to manipulate the price of a security, the jury returned a special verdict that affirmatively found the Government proved beyond a reasonable doubt that HYDRO was a security and the Defendant conspired to manipulate the price of HYDRO through both wash and spoof trading. [DE 121.]

Defendant filed this Motion asserting various arguments for why the Court should grant him a new trial. Many of Defendant's arguments have been thoroughly discussed at the pre-trial stage and ruled on in the Court's Omnibus Order denying Defendant's Amended Motions to Dismiss [DE 68], the Court's Omnibus Order on Motions in *Limine* [DE 90], the Court's Order granting the Government's *Daubert* Motion [DE 107] and the Court's Order granting the Government's Supplemental Motion in *Limine* [DE 108]. The majority of Defendant's Motion reiterates previously raised arguments the Court denied, and Defendant adds no new evidence to support a different result.

III. ANALYSIS

    A. EVIDENCE SHOWING DEFENDANT KNEW OF THE CONSPIRACY AND ENGAGED IN BOTH WASH TRADING AND SPOOF TRADING.

As discussed below, Defendants implemented a plan to maintain ownership of seventy percent of HYDRO tokens while offloading "a large chunk of the total token supply" to prioritize liquidating HYDRO with as minimal impact on the price as possible. [DE 137-1 at 23; DE 137-6 at 1.] Considering the record at trial, there was ample

---

[7] Regarding the two remaining counts charged in the Indictment, wire fraud in violation of 18 U.S.C. §§ 1343 and 2(a) ("Counts Three & Four"), the jury found Mr. Hampton not guilty.

evidence demonstrating Defendant's direct knowledge of the conspiracy and how he participated in furthering the conspiracy.[8]

Prior to any agreement with Moonwalkers to use its "bot" to increase trading volume, Defendant Hampton actively participated in maximizing Hydrogen's trading options. In July 2018, Defendant researched and prepared compliance documents necessary to attain clearance to trade HYDRO on various trading platforms like Bittrex and CoinEx. [DE 138-4.] On these trading platforms, Defendant coordinated moving tokens into "new wallets to 'trick' [] code[s] into increasing the supply". [DE 138-5.] By Defendant's own suggestion, he and his co-conspirators could coordinate their activity on these platforms to "sell [their] tokens and/or sell them to each other" to increase the trading volume. [DE 138-5.]

Documentary evidence confirms Defendant was directly involved and aware of Hydrogen's contract and relationship with Moonwalkers. In fact, Mr. Hampton and Tyler Ostern, Moonwalker's President, negotiated in a teleconference meeting the terms and scope of their contract one week before Mr. Hampton ultimately signed the market making services agreement on Hydrogen's behalf on October 4, 2018. [DE 133-28; DE

---

[8] The testimonial and documentary evidence presented at trial focused on Defendant's willful involvement in HYDRO's price manipulation scheme using a "bot" that conducted automated "spoof" orders and "wash" trades. Mr. Hampton negotiated the terms and conditions of Hydrogen's contract with the market-making firm that facilitated the manipulation scheme—Moonwalkers. [DE 133-6; DE 133-7; DE 133-9; DE 133-21.] Furthermore, Defendants Hampton and Kane agreed to pay Moonwalkers for its services, by initiating Bitcoin payments in exchange for their co-conspirators' efforts to manipulate the market for HYDRO through the bot's illegal trading features. [DE 133-10; DE 133-11.] To carry its burden of proving that HYDRO was a security, the Government presented two witnesses who testified they invested in HYDRO with the intent to earn a profit after observing HYDRO's increased trading volume on various exchange platforms. Taylor Test., Jan. 31, 2024, Berke Test., Jan. 31, 2024.

133-29; DE 133-30; DE 133-31; DE 138-21; DE 138-22.] Prior to signing the agreement, on October 1, 2018, Defendant Hampton and Defendant Kane discussed the purpose of the agreement with Moonwalkers, saying "liquidating [] HYDRO is the priority" and that Moonwalkers "will basically just sell it with as minimal impact on the price as possible." [DE 138-6 at 1.] Based on Mr. Hampton's research, he advised Defendant Kane that Moonwalkers' "bot is the best" and explained how Hydrogen could "limit potential risk" related to HYDRO's price given that Moonwalkers would only be able to access the tokens placed in Hydrogen's trading account. [DE 138-6.] One day after signing the agreement, Mr. Hampton even instructed Mr. Kane to "make sure [they] have enough HYDRO in both [accounts because] once [Moonwalkers] get set up, [they] will provide [Moonwalkers] with a target liquidation quantity each month." [DE 138-7.]

Furthermore, the evidence demonstrated Mr. Hampton's awareness of the scheme as he knowingly "forwarded" and circulated documents and other records to co-conspirators, including sharing Hydrogen's credentials to its trading accounts so Moonwalkers could access and sell HYDRO tokens on Bittrex and CoinEx. [DE 133-28; DE 133-29; DE 138-7.] Defendant Hampton declared his availability to meet with Mr. Ostern to discuss a "tactic" that would "insight [sic] a firesale to shake the weak hands, and get the sell walls to move down a bit" to "gain position then push [the] price hard." [DE 137-1 at 10.] Defendant even withdrew funds from accounts and closely monitored HYDRO's "volume distribution changing" on trading platforms while considering "sending more [bitcoin] around" to Moonwalkers in exchange for further volume trading and market manipulation. [DE 138-7; DE 138-8; DE 138-10.] According to Mr.

Hampton, "it[] [had] been great working with [Moonwalkers]," such that at the expiration of Hydrogen's term agreement he encouraged his co-conspirator, Mr. Kane, to renew the Moonwalkers contract as they "still plan[ned] on selling [their] company" and based on his research into other firms the amount Moonwalkers charged was "fair". [DE 137-1 at 43; DE 138-9.]

As it relates to Defendant's motion to set aside the verdict and enter a judgment of acquittal, for the reasons discussed above, Defendant has failed to demonstrate, based on the evidence presented, no reasonable jury could find him guilty beyond a reasonable doubt. Considering the testimonial evidence and exhibits presented at trial, the Government sufficiently proved relevant details and information from which a jury could conclude that Defendant had knowledge of the conspiracy and actively participated in both wash and spoof trading.

### B. DEFENDANT WAS NOT UNFAIRLY PREJUDICED BY THE JURY INSTRUCTIONS AND THE COURT'S EVIDENTIARY RULINGS.

#### i. Jury Instructions

Mr. Hampton maintains several complaints about the Court's instructions to the jury. Specifically, Defendant Motion's asserts the Court erroneously failed to include a specific intent element for Count One; erroneously misstated the second and third prongs of the Eleventh Circuit's formulation of the *Howey* test for Count One; and erroneously denied Mr. Hampton's "honest mistake of fact" jury instruction.

First, Mr. Hampton challenges the absence of a specific intent instruction that required the Government to prove Mr. Hampton knew HYDRO was a security. Count One charged the Defendant with knowingly and willfully conspiring to manipulate the price of a security by conspiring to either (i) effect any transaction in any security which

Page **8** of **19**

involves no change in beneficial ownership ("wash trading") for the purpose of creating a false or misleading appearance of active trading in such security or a false or misleading appearance with respect to the market for such security or (ii) effect alone or with another person, a series of transactions creating actual or apparent active trading in any security or raising or depressing the price of such security ("spoof trading") for the purpose of inducing the purchase or sale of such security by others. [DE 122 at 8, 11.] As previously explained in the Court's Order granting the Government's Supplemental Motion in *Limine* [DE 108] and the language of the relevant statute confirms, there is no specific or subjective intent requirement on whether an asset is a security in order to determine Defendant's guilt as it relates to the conspiracy to manipulate the price of a security in violation of 18 U.S.C. § 371 and 15 U.S.C. § 78i.[9]

The relevant statute, Section 78ff(a), clearly states,

> [a]ny person who willfully violates any provision of this chapter (other than section 78dd-1 of this title), or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder. . . which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than. $5,000,000 or imprisoned not more than 20 years, or both[.]

15 U.S.C. § 78ff(a).[10]  As held by other federal courts, the Government is required to prove specific intent only as it relates to the action constituting the fraudulent,

---

[9] In the Indictment, the Government charged Defendant with a conspiracy statute, 18 U.S.C. § 371, related to manipulating security prices in violation of 15 U.S.C. § 78i.

[10] 15 U.S.C. § 78ff(a) is the penalty statute for violations under its chapter, including violations of 15 U.S.C. § 78i(a)(1) ("wash trading") and 15 U.S.C. § 78i(a)(2) ("spoof trading").

misleading, or deceitful conduct, and not as to the knowledge that the instrument used is a security.[11] *United States v. Tucker*, 345 F.3d 320, 330 (5th Cir. 2003).

Next, Defendant argues the Court improperly excluded the word "interwoven" in its instruction on the second *Howey* prong and the word "ability" in its instruction on the third *Howey* prong.[12] As to this challenge, the Court finds no basis to conclude the Court's instruction on the *Howey* prongs and the instructions, as a whole, substantially prejudiced Mr. Hampton. The Eleventh Circuit is clear that, "[t]he court is not required to 'recite the jury instructions in the precise language requested by the defendant' where its charge adequately addresses the substance of the defendant's request. *United States v. Silverman*, 745 F.2d 1386, 1396 (11th Cir. 1984).

Lastly, Defendant contends the Court improperly refused to charge the jury with his theory of defense—an honest mistake of fact—instruction in line with the language approved by the Eleventh Circuit in *United States v. Ruiz*. 59 F.3d 1151, 1153–54 (11th Cir. 1995). Because district courts have broad discretion in formulating jury instructions, the accuracy of an instruction must be viewed in the context of the evidence and the entire jury charge. *United States v. Gonzalez*, 834 F.3d 1206, 1222 (11th Cir. 2016).

---

[11] Defendant may, if he wishes, present evidence relevant to subjective intent at sentencing. To ensure the efficient use of the Parties' time at sentencing, if Defendant intends to produce certain evidence, he must advise the Government and the Court and provide copies of all documents he intends to present by June 18, 2024. If the Government chooses to respond, it shall provide its response and copies of any documents it relies on to the Defendant and the Court by June 21, 2024.

[12] The Securities Act broadly defined a security to include various financial instruments, including "investment contracts," the type of instrument at issue here. In light of *S.E.C. v. W.J. Howey Co.*, the Eleventh Circuit developed a three-part, flexible test for determining whether an investment contract qualifies as a security. 328 U.S. 293, 298 – 99 (1946); *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).

Here, Mr. Hampton did not testify in his own defense and the Court found any inferences from the admitted evidence, largely presented by the Government, did not satisfy the "extremely low" threshold to support a jury instruction on this theory of defense. *Ruiz*, 59 F.3d 1151, 1155 (11th Cir. 1995) (affirming the use of defense theory instruction where there has been some evidence adduced at trial relevant to that defense). Defendant presented no admissible documentary or testimonial evidence to support Mr. Hampton having an honest belief that he was acting lawfully. As such, there was insufficient evidence in the record to support a mistake of fact instruction. Moreover, considering the Court's other instructions on the good-faith defense, character evidence and the definitions for "knowingly" and "willfully", the Court concludes that the jurors were sufficiently instructed to understand the issues and were not misled.[13] *United States v. Blanchet*, 518 Fed. App'x 932, 954 (11th Cir. 2013).

## ii. Evidentiary Rulings

Defendant asserts the Court committed six evidentiary errors. First, the defense asserts the exclusion of Mr. Hampton's expert witness, Professor Del Wright Jr., violated his Fifth and Sixth Amendment rights as Professor Wright's testimony over the regulatory uncertainty of crypto assets would have helped the jury's assessment of Mr. Hampton's state of mind and whether HYDRO is a security. [DE 152 at 16–18.] Defendant repeats the same arguments raised in its Response to the Government's *Daubert* Motion to Exclude Expert Testimony of Professor Del Wright Jr. [DE 102] and

---

[13] The Court instructed the jury that "knowingly" means that "an act was done voluntarily and intentionally and not because of a mistake or by accident," and "willfully" means that "the act was committed voluntarily and purposely, with the intent to do something the law forbids, with the bad purpose to disobey or disregard the law." [DE 122 at 22.]

resolved by this Court in its Order entered on January 26, 2024 [DE 107]. For the reasons explained in the Orders, the Court finds no error in excluding the testimony of Professor Del Wright. *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 591 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").

Second, the defense maintains the exclusion of evidence supporting Mr. Hampton's advice-of-counsel defense was erroneous and prejudicial. [DE 152 at 18–22.] Defendant Hampton relies on *United States v. Todd*, 108 F.3d 1329, 1334 (11th Cir. 1997), to argue the jury should have considered evidence that Mr. Kane told Mr. Hampton and others that legal counsel approved the decentralization plan and the hiring of a market maker. According to Defendant Hampton, this evidence is essential to the intent element of the charged offenses. However, as stated in the Court's Order [DE 90 at 8], the legality of the market maker and Hydrogen's decentralization plan was uncontroverted, and Defendant's proffered evidence was not probative to the material intent issue—whether Mr. Hampton knowingly or willfully intended to defraud through spoof and wash trading. Moreover, in light of the evidence presented at the trial, the Court included the general good-faith instruction to sufficiently instruct the jury on Mr. Hampton's defense.[14] *United States v. Romero*, 542 Fed. App'x 879, 883 (11th Cir. 2013).

Third, the defense objects to the Court excluding Mr. Hampton's extensive efforts to locate and hire a legitimate market maker. [DE 152 at 22–26.] Specifically,

---

[14] The Court read and instructed the jury on Defendant's good-faith defense prior to the jury deliberations. [DE 122 at 23.]

Defendant contends the Court should have permitted the presentation of certain evidence, including the August and September Slack communications between Mr. Hampton, Mr. Kane, and Mr. Chorlian and a spreadsheet identifying the various market maker candidates they were considering prior to signing the agreement with Moonwalkers. According to the Defendant, the Slack communications reveal Mr. Kane's insistence for Mr. Hampton to quickly choose a market-making firm despite Mr. Hampton's recommendation to contract with a different market-making firm instead of Moonwalkers. Defendant holds the position that these communications are relevant to Mr. Hampton's state of mind as evidence of his good faith. However, despite the hearsay concern as these statements constitute out of court statements used for their truth in violation of Fed. R. Evid. 801 (d)(1)(A), the Court finds that these statements reiterate the same "liquidity" scheme furthered by Defendants as Defendant Hampton discussed the price and goal he wanted to achieve with the other market-making firms, but those firms ultimately considered HYDRO to be "way too risky". [DE 152-1; DE 152-2.] Furthermore, in light of all the evidence presented, the exclusion of these statements was not unduly prejudicial. Therefore, a new trial is not warranted on this ground.

Fourth, Mr. Hampton reargues admitting "loss" evidence in the form of testimonials from victims of the manipulation scheme was unfairly prejudicial. [DE 152 at 26–30.] Here, testimony from David Maria and Daryl Berke regarding the loss incurred as a result of the market manipulation was relevant to the consideration and the Government's presentation of evidence as to whether HYDRO qualifies as a

security or not.[15]  Although loss is not an element to Count One of the Indictment, it is material to the determination of whether HYDRO is a security pursuant to *Howey*. Moreover, the Court limited the Government's presentation of its evidence related to loss, precluding the Government from eliciting any inflammatory or excessive testimony as to the impact of any loss on Mr. Maria and Mr. Berke.  Following the witness' direct examinations, Defendant cross-examined each witness on their respective testimony and admittedly had the opportunity to introduce its own evidence to rebut the Government's evidence of loss.  Pursuant to *Howey*, there was no requirement that Mr. Hampton know of the loss and therefore, Defendant's argument on the Court's evidentiary ruling admitting loss evidence is unavailing and does not require a new trial.

Fifth, the defense asserts precluding Mr. Hampton's presentation of evidence related to his workload and general responsibilities at Hydrogen was improper.  [DE 152 at 30–32.]  The Court permitted Mr. Hampton to introduce evidence related to his responsibilities at Hydrogen through his character witness, Laurence Brouilette.  Yet, Defendant claims the Court "severely limited" Ms. Brouilette's testimony by precluding evidence related to Mr. Hampton's work experience with API and the volume of his responsibilities at the time he was communicating with Mr. Kane, Mr. Chorlian, and Mr. Ostern about Moonwalkers and the liquidation plan.  According to the Defendant, such evidence would have demonstrated Mr. Hampton's state of mind and inattention to his communications with Mr. Kane, Mr. Ostern and others. While Defendant contends that

---

[15] The three *Howey* prongs the Government had to prove beyond a reasonable doubt with respect to HYDRO are: (1) an investment of money, (2) a common enterprise, and (3) an expectation of profit from the entrepreneurial or managerial efforts of others.. *Howey*, 328 U.S. at 299; *Unique Fin. Concepts, Inc.*, 196 F.3d at 1199.

the Court materially limited the jury's ability to hear these portions of Ms. Brouilette's testimony, the record demonstrates Defendant fairly presented this evidence to the jury. During Ms. Brouilette's direct examination, defense counsel asked, "[w]hat was Shane's overall work load like?" And Ms. Brouilette responded, "[i]t was pretty large because the particular area of the API that he worked on, he for a long time was the person that – [] the only person that knew how it worked." Trial Tr. Vol. VI at 108:10–14. Then, defense counsel asked Ms. Brouilette about Mr. Hampton's character:

> Q: And as someone who spent time with him in such a close space, what's your opinion on Shane's honesty and truthfulness?
> **MS. BROUILETTE**: I would say I have a pretty high opinion of Shane's honesty and truthfulness. He always struck me as a pretty up standing person.
> Q: Okay. What is your opinion on Shane's sort of as a law abiding person?
> **MS. BROUILETTE**: I think I would describe Shane as a law abiding person.
> Q: And what would give you – I guess why would you say that?
> **MS. BROUILETTE**: Well, I don't think I've ever witnessed Shane doing anything that wouldn't be considered law abiding. And [] he was already generally responsible, I think both at work and outside of work.

Trial Tr. Vol. VI 112:8–13; 113: 13–20. Although Ms. Brouilette testified that she was "always in the same room" with Mr. Hampton and likely interacted with him "a couple hours a day," the two were not colleagues within the same division as Ms. Brouilette worked "exclusively on the API side" whereas Mr. Hampton worked as a "software engineer." Trial Tr. Vol. VI 104:1-5; 104:15-18; 105:16-20. Ms. Brouilette was not Mr. Hampton's direct report, or vice versa, and ultimately lacked the personal knowledge to testify about the specific intricacies of Mr. Hampton's work experience and responsibilities as a software engineer at the time Hydrogen entered its contract with Moonwalkers.

Lastly, Defendant contends the Court improperly prevented defense counsel's examination of the Agent Francesca DeFazio, in front of the jury, regarding Mr. Ostern's purported inconsistent statements made in his pretrial interviews with the Government. DE 152 at 32–35. The issue originates from Mr. Ostern's testimony on direct examination when he purportedly contradicted his prior statement made during his interview with the Government about showing Moonwalkers' bot only once, not twice, to Hydrogen personnel.[16] In Mr. Ostern's direct examination, the following testimony was presented:

> Q: And Ms. Kirby, if you could please go to page two of Government's Exhibit 507. And if you could please blow up the bottom four lines on page two of Government's 507, please. All right, sir, is this your e-mail?
> **MR. OSTERN**: It is.
> Q: What's the date?
> **MR. OSTERN**: August 9th, 2018.
> Q: Who are you writing this e-mail to?
> **MR. OSTERN**: I believe Mr. Andy Chorlian.
> Q: Around this time, August 2018, had you spoken to Mr. Chorlian about Moonwalkers' services?
> **MR. OSTERN**: I believe so.
> Q: What did you show to Mr. Chorlian?
> **MR. OSTERN**: We had I think demonstrated the bot. We had shared screens and showed him all the features live.

---

[16] It is still unclear to the Court whether the Defendant's goal was to show Mr. Ostern's inconsistent recollection of the number of times he showed the bot to personnel at Hydrogen or to show Mr. Ostern's inconsistent recollection that the only person he identified, based on his 302 interview, whom he showed the bot was Mr. Hampton but in his direct examination, he testified he showed the bot to Mr. Chorlian. In any event, whatever the goal was, the defense had the opportunity to confront Mr. Ostern about his inconsistencies on cross-examination. Additionally, the defense was able to examine Agent DeFazio outside the presence of the jury for the Court to determine whether her examination would make a difference. After listening to Agent DeFazio's testimony, the Court concluded her testimony would not be necessary.

Trial Tr. Vol. IV 49:7–22. After defense counsel raised the issue and following detailed discussion with the Court, the Government attempted to clarify the record through the following dialogue with Mr. Ostern:

> Q: Sir, do you have a firm memory of when exactly you showed the bot, instead of just describing its feature. Do you remember a firm memory of when exactly you showed the bot?
> **MR. OSTERN**: It was one of two calls.
> Q: And do you have a firm memory?
> **MR. OSTERN**: Both. I'm not 95 percent.
> Q: And do you have a firm memory of to whom you showed the bot?
> **MR. OSTERN**: I remember there being multiple individuals on the call from the Hydrogen team. If I were to describe who specifically, I believe it was the leadership and then software developer. Off the top of my head.
> Q: Do you have a firm memory today that you showed the bot to Mr. Chorlian or somebody else?
> The Court: Only if you have a firm recollection.
> **MR. OSTERN**: I know it was the Hydrogen team. Outside of that, which individuals, I'm not sure.

Trial Tr. Vol. IV 82:15–83:7. Following the Government's examination, defense counsel cross-examined Mr. Ostern and showed him the 302-form summarizing his interview with the Government on February 23, 2023. The following was stated on the record:

> Q: If you could scroll to page three, please; and specifically paragraph two. And if you could pause. Mr. Ostern, please read the recitation of what you told the FBI on February 23, 2023, and please tell me if this refreshes your recollection?
> **MR. OSTERN**: Yes.
> . . .
> Q: Now, you had your first meeting with Hydrogen in August 2018, correct?
> **MR. OSTERN**: Yes.
> Q: And that meeting was, as you testified yesterday with Andrew Chorlian, right?
> **MR. OSTERN**: The whole team I think was on the initial call.
> Q: So on this call in August of 2018, this is where you showed the – trading bot that you had and George had developed, correct?
> **MR. OSTERN**: Yes, I believe so.
> Q: Yes. And you testified yesterday that you did this on SKYPE, right?
> **MR. OSTERN**: Yes.
> Q: You used a screen share?

>**MR. OSTERN**: Yes.
>Q: And you demonstrated in this August 2018 meeting that the bot could wash trade?
>**MR. OSTERN**: Just about all the features of the bot, I believe.
>Q: Let me go through them. The bot could wash trade, correct?
>**MR. OSTERN**: Yes.
>Q: The bot could spoof trade?
>**MR. OSTERN**: Yes.

Trial Tr. Vol. V 75:9–76:23.

Similar to Mr. Hampton's argument regarding his character witness, he asserts the Court, here, unfairly prejudiced the Defendant by limiting examination of Agent DeFazio before the jury. As demonstrated in the above-cited exchange between defense counsel and Mr. Ostern, Defendant had an opportunity to cross-examine Mr. Ostern and impeach him on any prior inconsistent statement he made during his pre-trial interview with the Government. Following Defendant's cross-examination of Mr. Ostern, the Court correctly limited Defendant's examination of Agent DeFazio related to Mr. Ostern's previous statements pursuant to Fed. R. Evid 801(d)(1)(A). Moreover, Defendant's examination of Agent DeFazio, outside the presence of the jury, confirmed that Mr. Ostern thought he showed the bot to Hydrogen personnel, including Mr. Chorlian and others although he was not certain on everyone in attendance during that meeting. Therefore, given that Defendant had an opportunity to confront Mr. Chorlian and chose not to cross-examine him in depth about who was or was not included on the August 2018 Skype call, it was not necessary for Defendant to question Agent DeFazio in the presence of the jury regarding who Mr. Ostern previously identified as being on the August 2018 Skype call when he demonstrated the bot's functions.

In sum, Defendant has failed to demonstrate that the evidence weighs so heavily against the verdict that a serious miscarriage of justice may have occurred. In light of

evidence presented at trial, Defendant has neither raised a sufficient challenge to the jury instructions nor shown unfair prejudice necessitating a new trial.

Therefore, it is ORDERED that:

1. Defendant's Motion [DE 152] is DENIED.

2. If Defendant intends to produce certain evidence relevant to subjective intent at sentencing, Defendant must advise and provide copies of all documents he intends to present to the Government and the Court by June 18, 2024. The Government's response and copies of any documents it intends to rely on in opposition must be provided to the Defendant and the Court by June 21, 2024.

DONE AND ORDERED in Miami, Florida, this 7th day of June, 2024.

_____
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE