## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-CR-20172

UNITED STATES OF AMERICA

    **v.**

SHANE HAMPTON

    **Defendant.**

_____/

### THE UNITED STATES' SENTENCING MEMORANDUM AND
### OBJECTION TO THE PRESENTENCE INVESTIGATION REPORT

The United States, by and through its undersigned counsel, files this brief to aid the Court in sentencing Defendant Shane Hampton.   In addition, the United States has one objection to Defendant's Presentence Investigation Report (PSR) in light of a determination made by Judge Williams at the sentencing of Defendant's co-defendant, Michael Kane.   While Defendant lodged numerous objections to the PSR, the government's response focuses on those issues that are relevant to Defendant's United States Sentencing Guidelines ("Guidelines") calculations.   Specifically, this brief explains why Defendant is responsible for a loss amount greater than $1.5 million but not greater than $3.5 million, why each of the enhancements applied in the PSR is appropriate (with the exception of the role enhancement), and why Defendant is not eligible for a two-level reduction under the newly-adopted zero-point offender provision.

### FACTUAL BACKGROUND

#### A.  The Offense Conduct

Defendant was indicted on April 20, 2023, and charged with one count of conspiracy to commit securities price manipulation, one count of conspiracy to commit wire fraud, and two substantive counts of wire fraud.   The Court conducted a seven-day jury trial beginning on January 29, 2024.   On February 7, 2024, the jury returned a verdict in less than four hours, finding Defendant

guilty of the two conspiracy counts.  As to Count One, the jury returned a special verdict which unanimously found that the "Government ha[d] proven beyond a reasonable doubt that HYDRO [wa]s a security" and that Defendant had conspired to manipulate the price of HYDRO through both wash trading and spoof trading.

At the time of the conspiracy, Defendant was the Head of Financial Engineering of Hydrogen Technology.  In early 2018, Defendant, along with others at Hydrogen Technology, created approximately 11 billion crypto tokens on the Ethereum blockchain.  Ex. A, Trial Testimony of Andrew Chorlian, Trial Tr. Vol. II at 52, 56.  They named the token HYDRO.  Shortly after their creation, Defendant was given approximately 277 million HYDRO tokens (roughly 2.5% of the total supply of HYDRO).  *Id.* at 57–58.  Two of Defendant's co-conspirators and Matthew Kane were given 27.5% between them.  *Id.*  And Defendant and his co-conspirators gave away approximately 25% of the tokens in an effort to get HYDRO into the hands of a large number of people outside the company.  *Id.* at 59.  The remaining 45% of the HYDRO tokens were held in various company repositories for sale and future distribution.  This gave Defendant and other company insiders, including his co-conspirators, control over approximately 75% of the total supply of HYDRO.

In the summer of 2018, Defendant, and others at Hydrogen Technology, began taking steps to get HYDRO listed on crypto-token exchanges in order to sell tokens to raise funds for the company.  Ex. A at 60, 69, 77, 134–35; D.E. 138, Ex. 4.  After getting the token listed on various exchanges, Defendant's co-conspirators Michael Kane and Andrew Chorlian began trying to sell the tokens to raise capital, but there was not sufficient demand in the market to support the conspirators' desired volume of sales.  Ex. A at 62, 69.  At the time the conspirators began selling the tokens, and indeed throughout the entire conspiracy and to this day, the token never had any actual utility or users, and therefore there was little actual demand for the token.  *Id.* at 63–64; D.E. 137, Ex. 1 at 55.  What demand did exist was purely from investors purchasing the token as a speculative vehicle.  Ex. A at

61–62, 64.  As a result, if Defendant and his co-conspirators had sold all the tokens they wanted to at unmanipulated market prices, it would have crashed the price of the token.  *Id.* at 64, 70; Trial Testimony of Tyler Ostern, Ex. B, Trial Tr. Vol IV at 91, 100.

Accordingly, Defendant, at the direction of Kane, set out to find a "market maker" to help him and his co-conspirators sell more tokens.  Ex. A at 64–65.  In October 2018, Defendant hired a company called Moonwalkers to use a custom-designed trading software bot to place thousands of spoof orders and wash trades for the HYDRO token on a crypto trading exchange called Bittrex.  *Id.* at 65.  The bot was specifically designed to engage in manipulative conduct and these features were openly advertised to Defendant and others at the time they engaged Moonwalkers to operate the bot.  *Id.* at 65–69.  Defendant personally interviewed Tyler Ostern, another co-conspirator and the CEO of Moonwalkers, before advocating that Hydrogen Technology hire Moonwalkers.  *Id.* at 77; D.E. 138, Ex. 6; D.E. 138, Ex. 22; Ex. B at 53–57.  Defendant also signed a contract with Moonwalkers on behalf of Hydrogen Technology to engage Moonwalkers' market manipulation services.  D.E. 133, Ex. 31.

Moonwalkers began working for Defendant and Hydrogen Technology in October 2018 and operated the bot on Bittrex through early April 2019.[1]  Ex. B at 10.  Defendant and his co-conspirators used the bot to flood the market with fake orders for HYDRO, significantly inflating the trading volume of the token in an effort to mislead other investors and induce them to buy and sell HYDRO at manipulated prices.  Ex. A at 65–69.  Defendant and his co-conspirators also openly discussed the manipulation for months in a Slack channel.  *Id.* at 86; D.E. 137, Ex. 1.  Defendant paid Moonwalkers in Bitcoin in exchange for their manipulation of the market for the HYDRO token.  Ex. A at 102.

---

[1] During at least part of the conspiracy, Defendant and his co-conspirators also used the bot to manipulate the market on another exchange called Coinex.  Ex. B at 10.  The United States was not able to obtain trading data from Coinex in order to determine the full scope of manipulation on that exchange.  According to documents produced by Hydrogen Technology, however, Defendant and his company generated over $700,000 in profits via sales on Coinex.  Accordingly, Defendant's claim that "there was no manipulation in any of the other sales" is false.  D.E. 156 at 8, 18.

During this six-month period, Defendant and his co-conspirators used the bot to wash trade over 1.5 billion HYDRO tokens worth approximately $6.5 million. D.E. 138, Ex. 27 at 3. And in October 2018 alone, Defendant and his co-conspirators placed spoof orders for nearly 30 billion tokens worth over $130 million. *Id.* at 6. In total, they spammed the Bittrex order book with spoofs totaling 100 billion tokens worth over $300 million. *Id.* All of this was fake volume intended to deceive and trick other investors into thinking there was legitimate demand for the HYDRO token to induce them to buy HYDRO from Defendant and his co-conspirators at artificially inflated prices. Ex. B at 8, 12, 19.

The scheme worked. At trial, two victims testified that they had seen the HYDRO trading volume going up on Bittrex in the fall of 2018 and they thought it was real people, like them, buying and selling the token. Ex. C, Trial Testimony of Mark Taylor and Daryl Berke, Trial Tr. Vol. III at 181–82, 200–02. They viewed this trading activity as a sign of legitimate demand for the HYDRO token, which indicated a healthy market and a potential for them to profit. *Id.* These individuals also testified that they saw statements made by Defendant and his company regarding the protocols they were building that would one day use the HYDRO tokens, further increasing their demand. *Id.* at 180, 182–83, 198–99.

Unfortunately for these individuals and thousands of others like them, none of it was true. Testimony and other evidence at trial showed that a significant portion of the HYDRO trading volume on Bittrex was fake volume generated by Defendant and his co-conspirators. Ex. B at 13, 20, 24–25; *see* D.E. 138, Ex. 27. And testimony from Andrew Chorlian and statements made by Michael Kane showed that Defendant and his co-conspirators had not generated actual demand for the token and that none of the clients Kane had repeatedly alluded to in public statements were actually using the HYDRO token. Ex. A at 172–73; D.E. 137, Ex. 1 at 55. In the end, over 5,500 individuals lost approximately $3.6 million buying and selling HYDRO on Bittrex during the time period Defendant

and his co-conspirators were operating the bot.  *See* Estimated Loss Calculations Table, Ex. D at 1. At the same time, Defendant and his company reaped profits of over $1.5 million from their HYDRO sales.  D.E. 138, Ex. 27 at 7.

### B.  The Applicable Guidelines Range

Pursuant to U.S.S.G. § 2B1.1, Defendant has a base offense level of seven.  The amount of loss, as measured by the gain that resulted from the offense, is more than $1,500,000 but not more than $3,500,000, resulting in an increase of sixteen levels, pursuant to Section 2B1.1(b)(1)(I).  The scheme involved 10 or more victims and employed sophisticated means, warranting a two-level increase under Section 2B1.1(b)(2)(A)(i) and another two-level increase under Section 2B1.1(b)(10)(C).  Defendant was an organizer/leader of the scheme, which involved five or more individuals, warranting a two-level increase under Section 3B1.1(c).  Accordingly, Defendant's total offense level is 29.  As noted in the final PSR, the zero-point-offender adjustment does not apply because the defendant had an aggravating role in the crime.  D.E. 161-1, at 6.  Thus, the PSR, if modified to apply only a two-point enhancement for Defendant's role in the scheme, properly calculates Defendant's total offense level as 29, with a corresponding Guidelines range of 87–108 months.

### C.  Defendant's Objections

Defendant's Objections to the Presentence Investigation Report (D.E. 156) should be denied. In his motion, Defendant makes four claims of error that impact his guidelines: (1) incorrect loss amount; (2) incorrect application of the organizer/leader enhancement; (3) incorrect application of the enhancement for 10 or more victims; and (4) failure to credit him with the first-time offender reduction.  None is persuasive.  The recommendations made by U.S. Probation as to the sentencing guidelines calculations should be adopted by this Court.

## ARGUMENT

### A. Defendant's Loss Amount

Defendant is responsible for a loss of more than $1.5 million but not greater than $3.5 million. The PSR properly applies, and the United States properly proposes, a 16-level enhancement, because under any method of calculating loss employed by the Court, the amount is at least $1.5 million.

Loss, under U.S.S.G. § 2B1.1(b)(1), is the greater of actual loss or intended loss, where "actual loss" "means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 Appl. n.3(A)(i). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money" and "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* at Appl. n.3(A)(iii)–(iv). When calculating loss, "[t]he court need only make a ***reasonable estimate*** of the loss." *Id.* at Appl. n.3(C) (emphasis added); *see United States v. Melgen*, 967 F.3d 1250, 1265 (11th Cir. 2020); *see also United States v. Sullivan*, 765 F.3d 712, 716 (7th Cir. 2014) (absolute accuracy is not required as long as the calculation is not "outside the realm of permissible computations" (internal citations omitted)).

### i. The Court Should Use Gain as an Alternative Measure of Loss

The Guidelines instruct that the Court should use the gain that resulted from the offense as an alternative measure of loss if there is a loss but it cannot reasonably be determined. U.S.S.G. § 2B1.1 Appl. n.3(B). *See United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009); *see also United States v. Vrdolyak*, 593 F.3d 676, 681 (7th Cir. 2010) (holding that gain may appropriately be used as an alternative measure for loss even where there is only a "*probable* loss"). Because individuals indisputably lost money as a result of Defendant's scheme but their exact losses are difficult, if not impossible, to measure, the Court should use the gain from the conduct as an alternative measure of loss.

Indeed, courts routinely use gain as a measure of loss when sentencing defendants in fraud cases. *United States v. Abouammo*, No. 19-CR-00621-EMC-1, 2022 WL 17734424, at *2 (N.D. Cal. Dec. 16, 2022) (noting that Ninth Circuit has "used gain to measure loss in the context of fraud" and collecting cases); *see United States v. Anwar*, No. 20-30205, 2022 WL 777212 (9th Cir. Mar. 14, 2022) (loss calculation based on total revenue received by defendant's illegitimate companies); *United States v. Mirando*, No. 19-50384, 2021 WL 4947330 (9th Cir. Oct. 25, 2021) (loss calculation based on total revenue obtained from overbilling insurance companies); *United States v. Randock*, 330 F. App'x 628, 629 (9th Cir. 2009) (applying gain as measure of loss and rejecting defendants' argument that their "fraud caused no loss or that the gain does not reasonably reflect any loss"). This is particularly true for securities violations, like those at issue here, where loss is not reasonably calculable due to the various market factors that impact the price of securities. *See, e.g.*, *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) (noting that, in comparison to securities fraud involving "sham" company that does not exist, "measurement of loss becomes considerably more complex . . . when the court confronts a 'pump-and-dump' scheme involving an otherwise legitimate company").

For instance, in *United States v. Gordon*, the Tenth Circuit affirmed a district court's use of gain as a measure of loss in a case involving a scheme similar to that at issue here. In *Gordon*, the defendants "acquired millions of shares in 'penny stock' companies . . . [and] coordinated trading among themselves and nominees they controlled to create the false appearance of an active market for the stock[s]." *United States v. Gordon*, 710 F.3d 1124, 1128 (10th Cir. 2013). In other words, the defendants in *Gordon* were wash trading to artificially inflate the value of penny stocks while simultaneously selling off their own shares of those stocks. The Tenth Circuit affirmed the district court's use of gain after the court had "determined that it would be too difficult to determine the actual losses suffered by each individual investor affected by the conspirators' manipulation scheme." *Id.*

at 1161.  The Tenth Circuit explained that courts are not required to "employ an empirical inquiry that takes account of the effect of every conceivable variable that could possibly affect a defendant's gain from an illicit stock sale."  *Id.* at 1163.

Similarly, in *United States v. Parris*—another case with facts analogous to the instant one—a district court used the defendant's gain as a measure of loss.  In *Parris*, the defendants engaged in fraud that caused a spike in the trading volume of certain penny stocks, which allowed them to sell off a large volume of their shares of the stocks without tanking the price.  *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).  The court agreed with the government and the PSR's determination that "the difficulties inherent in calculating loss to the market in this case made [the use of gain] appropriate."  *Id.* at 748.  Moreover, in determining that the gain was "traceable to the defendants' frauds," the court explained that, although the stock had some pre-fraud value, the defendants' sale of millions of shares over a few months would have tanked the price of the stock, absent defendants' manipulation.  *Id.*  As the court explained, "there would have been no significant market for the new shares—and little to be gained from their sale—without the artificially inflated demand created by" the defendants.  *Id.*

Here, Defendant cannot legitimately dispute that his fraud caused HYDRO investors to lose money.  Indeed, two such investors testified at trial that they lost thousands of dollars investing in HYDRO after deciding to invest when they saw the token's trading volume shoot up on Bittrex.  Defendant concedes, as he must, that these individuals lost money but claims that those losses "were not fully caused by the instant scheme."  D.E. 156 at 9.  Even assuming Defendant is correct,[2] and their losses are not *fully* attributable to his conduct, at least some portion of their losses, and those of

---

[2] Defendant is in fact incorrect.  The two individuals at issue testified that (1) they purchased HYDRO on Bittrex after they saw its volume increasing on the exchange, leading them to believe there was legitimate demand for the token; and (2) they never would have purchased the token on Bittrex had they known that a significant portion of the volume on that exchange was fake volume generated by Defendant and his co-conspirators.  They were induced to purchase HYDRO by the false representations put into the market by Defendant and his co-conspirators.  Accordingly, their losses and those of many others just like them were "fully caused" by Defendant's scheme.

thousands of others similarly situated, are attributable to Defendant's criminal scheme.  Because evidence of actual loss was documented and before the Court, Defendant's gain may properly be used as a measure of loss.  Ex. C at 190, 204–05.

Where, as here, over 5,500 people lost money investing in HYDRO at various times and in various amounts during the conspiracy, it is difficult if not impossible to determine the exact amount of loss that is attributable to the scheme and that which is attributable to other market factors.  This case, like others involving market manipulation, "exemplifies the type of logistical burdens the gain-for-loss approach was designed to alleviate."  *United States v. Coscia*, 866 F.3d 782, 801 (7th Cir. 2017); *see also United States v. Campbell*, 765 F.3d 1291, 1304–05 (11th Cir. 2014) (rejecting defendant's "'bottom-up' approach to calculating loss" where "defendant's conduct was permeated with fraud"); *United States v. Orton*, 73 F.3d 331, 334–35 (11th Cir. 1996) (explaining that "an exhaustive inquiry is not required in every case" involving a complicated fraudulent scheme in which the victims' loss is difficult to calculate).  Here, Defendant's conduct related to the creation, distribution, and sale of HYDRO was "permeated with fraud."  *Campbell*, 765 F.3d 1291, 1305.  Defendant's scheme was incredibly complex, using a trading bot to place thousands of anonymous trades per minute, interspersing wash trades, spoof orders, and numerous other manipulative tactics with real orders timed to buy low and sell high.  Defendant not only manipulated the price upwards but also intentionally manipulated the price of HYDRO *downwards* at times to "gain position" and buy HYDRO at lower prices that could then be resold at higher prices following another round of manipulation.  Defendant "made money by artificially inflating and deflating prices. Every time he did so, he inflicted a loss," and the parties who traded across from him "were always harmed by the artificial shift in market price."  *Coscia*, 866 F.3d at 801–02.

Just as in *Gordon* and *Parris*, Defendant and his co-conspirators artificially inflated the volume of HYDRO in order to sell off their own HYDRO without tanking the price.  Determining

the actual losses incurred by each of the thousands of investors on Bittrex during the relevant time period, not to mention the countless other investors buying and selling HYDRO *on other exchanges* at the same time, is not reasonably determinable.  What can be determined with extreme accuracy, however, is Defendant and his co-conspirators' ill-gotten gains from their scheme.  Moreover, those gains are "traceable to the defendants' frauds," because testimony and other evidence at trial established that "there would have been no significant market for the new shares—and little to be gained from their sale—without the artificially inflated demand created by" Defendant and his co-conspirators.  *Parris*, 573 F. Supp. 2d at 748.   Accordingly, the Court can and should use the gain from the scheme as a measure of loss.[3]

Defendant's arguments to the contrary are meritless.  Defendant largely adopts the arguments of his co-conspirator, Michael Kane, and contends that his gain should not be used as a measure of loss because there was no "tell-tale spike" in the price of HYDRO after the manipulation began.  But that is irrelevant.  He points to no provision of the Guidelines or caselaw to support this argument.  Under the Guidelines and relevant case law, all that matters is that there were losses (which was established through testimony and documents at trial) and the full extent of those losses cannot reasonably be calculated.

Moreover, Defendant's argument rests on a logical fallacy.  He assumes that, because the price of HYDRO did not go up significantly as a result of the manipulation, the price of the token was not *impacted* by the manipulation.  But the data in fact show the opposite.  The data show that Defendant's manipulation helped to *maintain* the price of HYDRO, despite Defendant offloading billions of tokens

---

[3] Indeed, the loss amount determined by U.S. Probation and the government is a conservative estimate.  Evidence introduced at trial showed that the conspirators' net profits from sales of HYDRO on Bittrex during the time period they were operating the bot were $1,574,066.  This figure does not include any of Defendant's sales of HYDRO on Coinex, another exchange where the co-conspirators generated at least $700,000 in profits while actively manipulating the market on that exchange.  Defendant incorrectly suggests that this $700,000 was generated prior to engaging Moonwalkers and that he and his co-conspirators manipulated "*only* the Bittrex market beginning in *October 2018*."  D.E. 156 at 18.  Contrary to Defendant's assertion, this figure does <u>not</u> include any of Defendant's sales of HYDRO prior to engaging Moonwalkers.

onto the market, allowing Defendant and his co-conspirators to sell their tokens at a higher price than they otherwise would have and causing new market participants to purchase HYDRO at inflated prices.[4]  Indeed, testimony at trial showed that Defendant and his co-conspirators hired Moonwalkers for exactly this reason—they were concerned that their sales of HYDRO would crash the price of the token given that they controlled over 60% of the total token supply.  Ex. A at 64, 70; Ex. B at 91, 100. Defendant's manipulation allowed him to sell billions of tokens without crashing the price, which was critical to the scheme's success.  And as a result, countless individuals purchased HYDRO at artificially-inflated prices.  Moreover, Defendant also engaged in manipulation designed to drive the price of HYDRO down, negatively impacting the value of HYDRO held by other market participants. Ex. B at 100–01.  Anyone who was unfortunate enough to sell during a time when Defendant and his co-conspirators were actively manipulating the price downwards was harmed and lost money as a result of Defendant's conduct.

     **ii.**    **Other Loss Calculation Methods Would Result in an Equal or Greater Sentence**

Using gain as a measure of loss is in fact favorable to Defendant as it results in a more conservative estimate of loss than other methods available to the Court.  The Court could look to the total losses (over $3.6 million) incurred by investors on Bittrex during the time period the bot was operating.  Alternatively, the Court could look to the total losses (over $2.4 million) incurred by only those investors who first traded HYDRO on Bittrex after the manipulation started (i.e., individuals who were more clearly induced to purchase or sell as a result of the manipulation).  Finally, the Court could use the Modified Rescissory Method (resulting in losses of anywhere from $7.8 million to $12.7 million), which is specifically contemplated by the Guidelines for securities price manipulation

---

[4] Defendant also parrots Kane's argument that his co-conspirator Mr. Chorlian's "dumping" of tokens "could have caused investor losses."  D.E. 156 at 18–19.  Mr. Chorlian sold approximately 270 million HYDRO tokens between November 2018 and April 2019.  By comparison, Defendant and his co-conspirators sold almost 4 billion tokens on Bittrex alone. If, as Defendant admits, Chorlian's "dumping" of tokens caused investor losses, then *Defendant's* dumping of over 14 times as many tokens while simultaneously flooding the market with hundreds of billions of tokens' worth of fake orders certainly caused investor losses.

schemes.  Under any of these approaches, Defendant's loss amount would be well over $1.5 million, and could potentially climb to over $9.5 million, which would result in an additional four-point increase in his Guidelines calculation.

Specifically, the Guidelines provide that special rules shall be used to assist in determining loss in certain types of cases, including in cases that involve the fraudulent inflation or deflation in the value of securities.  U.S.S.G. 2B1.1, Appl. n.3(F)(ix).  "In a case involving the fraudulent **inflation or deflation** in the value of a publicly traded security or commodity, the court in determining loss may use **any method that is appropriate and practicable** under the circumstances."  *Id.* (emphases added).  "One such method is calculating the difference between the average price of the security during the period that the fraud occurred and the average price of the security during the 90-day period after the fraud was disclosed to the market and multiplying the difference in average price by the number of shares outstanding."  *Id.*  Under this method, Defendant's loss amount would be at least $7.8 million and up to $12.7 million.

Here, the fraud was not explicitly "disclosed" to the market.  Instead, the trading bot's manipulation began and ended at precise points in time.  As a result, the modified rescissory method is particularly apt here given the ease with which the price can be measured during the price manipulation (i.e., when the bot was operating) and in the 90-day window following the manipulation.  According to publicly available price history data (admitted into evidence by the Court at Defendant's trial, *see* D.E. 133, Ex. 20), the average price of HYDRO during the bot's operation was $0.00232086 and its average price during the 90-day period following the bot's operation was $0.00160996, resulting in a price difference of $0.00071090.  Multiplying that value by the total outstanding shares of HYDRO (11,111,111,111) results in an estimated loss amount of over $7.8 million.  Ex. D at 3.  Alternatively, the Court could look only at the price history of HYDRO on the Bittrex exchange, which was entirely corrupted by Defendant's manipulation scheme.  Not surprisingly, given the scope

of Defendant's manipulation of the Bittrex exchange, the price difference between the manipulation

and post-manipulation time period is even greater, resulting in an estimated loss of over $12.7 million.

*Id.* at 2.

Defendant also suggests that his loss amount cannot be different from that determined for

Chorlian and Ostern, two of his co-conspirators.  To the extent Defendant challenges the proposed

loss amount on these grounds, his challenge is not as to the Guidelines calculation but rather to the

reasonableness of his potential sentence under 18 U.S.C. § 3553(a).  "In imposing a sentence, district

courts must consider several factors, including the need 'to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct.'"  *United

States v. Abovyan*, 988 F.3d 1288, 1311 (11th Cir. 2021), *overruled on other grounds by Ruan v.

United States*, 597 U.S. 450 (2022).  It is well settled, however, "that codefendants and even

coconspirators may be sentenced differently for the same offense."  *United States v. Pierce*, 409 F.3d

228, 235 (4th Cir. 2005); *see U.S. v. Quinn*, 359 F.3d 666, 682 (4th Cir. 2004) (holding that "mere

disparity among co-defendants' sentences is not a permissible ground for departure. . . .  even where

the disparity results from the use of different loss figures for co-defendants").  Here, Defendant is not

"similarly situated" to Chorlian and Ostern because the latter two "pled guilty and their plea

agreements provided for how loss was to be determined."  *Abovyan*, 988 F.3d at 1311.  Accordingly,

"any disparity between the sentences of [Defendant] and them is not an 'unwarranted' sentence

disparity within the meaning of § 3553(a)(6)."  *Id.*

**B.  Defendant Should Receive an Organizer/Leader Aggravating Role Adjustment**

As the evidence at trial showed, Defendant was an organizer and leader of the scheme.  The

government believes that Michael Kane should have received a four-point role enhancement and

Defendant should have received a three-point role enhancement based on their respective conduct.

On May 6, 2024, Judge Williams held a sentencing hearing for Kane at which the Court applied a

two-point role enhancement for Kane.  Based on the Court's finding, the government believes that Defendant Hampton should also receive a two-point role enhancement, because his conduct clearly qualifies him for an enhancement but it should not be greater than that applied to Kane.

Courts are advised to look at seven factors in determining a defendant's aggravating role enhancement under USSG § 3B1.1(a): (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.  *See* Appl. n.4, USSG § 3B1.1.  The commentary anticipates there can be more than one leader of a criminal scheme.  *Id*.  In fact, the "defendant does not have to be the sole leader or kingpin of the conspiracy to be considered an organizer or leader within the Guidelines."  *United States v. Rendon*, 354 F.3d 1320, 1332 (11th Cir. 2003); *see United States v. Lovell*, 579 F. App'x 875, 876 (11th Cir. 2014) (affirming leader/organizer enhancement and finding that defendant's "exertion of control over at least one other person in the conspiracy qualifie[d] him as an organizer or leader").

Six of the seven factors relevant under the Guidelines apply to Defendant and counsel in favor of an aggravating role enhancement.

- **Decision-Making Authority** – Defendant was the Head of Financial Engineering of Hydrogen Technology, and one of the most senior employees at the company. Defendant was expressly assigned decision-making authority regarding who to hire to help the company sell its HYDRO tokens.  And Defendant continued to exercise such authority throughout the pendency of the scheme, signing the original contract, negotiating the terms of a follow-on contract, and "owning" the relationship with Moonwalkers throughout.  Ex. A at 50; D.E. 133, Ex. 31; D.E. 137, Ex. 1 at 10, 15, 49–50; D.E. 138, Ex. 6 at 2.

- **Participation in Commission of Offense** – As noted above, Defendant made the decision to hire Moonwalkers after explaining that "their bot [wa]s the best." Defendant met with Moonwalkers after their manipulation began to discuss specific manipulation tactics and strategies (e.g., instigating a fire sale).  And Defendant advised Moonwalkers to spend more on transaction fees to "pump volume again for

some attention." Finally, Defendant coordinated the payment of Moonwalkers' fees and advocated for continuing to use Moonwalkers three months into the scheme. D.E. 137, Ex. 1 at 10–11, 15, 51; D.E. 138, Ex. 6 at 2; D.E. 138, Ex. 11.

- **Recruitment of Accomplices** – Defendant took the lead in searching for someone to help sell HYDRO and personally recruited Ostern, the key accomplice in the scheme. Ex. A at 77; Ex. B at 53–58; D.E. 133, Ex. 30.

- **Claimed Right to a Larger Share of Profits** – This factor does <u>not</u> apply to Defendant, because he did not claim a right to a larger share of the profits and in fact did not profit as much as some of the others involved in the scheme.

- **Planning/Organizing Offense** – Defendant was involved in the initial decision to create 11 billion crypto tokens, the majority of which were controlled by him and his co-conspirators. As explained above, Defendant took the lead in organizing the offense by interviewing numerous "market makers" and ultimately deciding to hire Moonwalkers. Defendant also discussed with Kane and Chorlian the possibility of wash trading tokens amongst themselves prior to hiring Moonwalkers and planned how best to apportion their tokens and "buying power" across exchanges once Moonwalkers was engaged. Ex. A at 52, 56–58, 60, 69, 77, 134–35; D.E. 138, Ex. 5 at 3; D.E. 138, Ex. 7.

- **Nature and Scope of Illegal Activity** – Defendant and his co-conspirators' manipulation completely corrupted the market for HYDRO. Defendant and his co-conspirators used their trading bot to wash trade over 1.5 billion HYDRO tokens worth approximately $6.5 million. And they spammed the Bittrex order book with spoofs totaling 100 billion tokens worth over $300 million. D.E. 138, Ex. 27.

- **Degree of Control and Authority Exercised Over Others** – Defendant exercised direct control over Ostern, who was responsible for operating the trading bot used to manipulate the market. Ostern sought guidance from Defendant regarding specific manipulation tactics and strategies, and Defendant instructed Ostern how to proceed and to engage in manipulative conduct. D.E. 137, Ex. 1 at 10-11, 15, 51; D.E. 138, Ex. 6 at 2; D.E. 138, Ex. 11.

Defendant's arguments against this enhancement contain a number of statements that are directly at odds with evidence introduced at trial. For instance, Defendant contends that he was not "instrumental in the perpetuation of the instant scheme." D.E. 156 at 10. And he claims that he "did not supervise, manage, or direct a criminally liable participant." *Id.* But Defendant took the lead in searching for a "market maker," Defendant made the decision to hire Moonwalkers, Defendant "own[ed]" the relationship with Moonwalkers and expressly directed their manipulation, and Defendant continued to advocate for using Moonwalkers months into the scheme.

Defendant, again borrowing from Kane's arguments, contends that he should not receive a role enhancement because two of his other co-conspirators, Ostern and Chorlian, did not receive aggravating role enhancements.  Again, however, this argument misses the point.  *See Abovyan*, 988 F.3d at 1311; *Pierce*, 409 F.3d at 235.  The question is whether *Defendant*, based on the Guidelines and the facts of the case, was a leader or organizer of the criminal conduct.  Defendant was a leader and organizer of the criminal activity at issue here.  And to the extent Defendant seeks a variance based on alleged sentencing disparities between him and his co-conspirators, it is not warranted because, as explained above, they are not "similarly situated."  *Abovyan*, 988 F.3d at 1311.  Chorlian and Ostern pleaded guilty pursuant to agreements with the government almost one year before trial in this case.  Defendant had no such agreement.  Moreover, both Chorlian and Ostern sought mitigating role adjustments at their sentencings which the government objected to strenuously.

### C.  Defendant's Criminal Conduct Involved 10 or More Victims

During the time period that Defendant and his co-conspirators were operating the bot on Bittrex, over 5,500 individuals lost money investing in HYDRO.  Moreover, 4,709 of the individuals who lost money made their first ever purchase or sale of HYDRO on Bittrex only after Defendant and his co-conspirators began manipulating the market for HYDRO.  Ex. D at 1.  In other words, ***85%*** of the people who lost money during the relevant time period conducted their first HYDRO transaction on Bittrex only after Defendant and his co-conspirators began flooding the exchange with fake volume.

At bare minimum, every one of the individuals who first bought or sold HYDRO on Bittrex after Defendant's manipulation and deception began is a victim of his crime.[5]  Defendant was found

---

[5] Restricting the victim analysis to just those individuals who purchased or sold HYDRO on Bittrex after Defendant's manipulation began almost certainly understates the true number of victims.  Given Defendant's control of the majority of the total supply of HYDRO and his aggressive manipulation of the token's volume and price (plus his manipulation of the token on Coinex), it is probable that every person that bought or sold HYDRO *on any exchange* was harmed by Defendant's conduct.

guilty of placing wash trades and spoof orders through the bot that were intended to send false and misleading information to other market participants about the market supply and demand for HYDRO, to deceive market participants about the same, and to fraudulently induce other market participants to buy or sell HYDRO.  In other words, Defendant was found guilty of targeting other investors on Bittrex and making false representations to them about the true supply and demand for HYDRO.  He cannot now claim that those very same individuals, who traded their HYDRO on Bittrex only after Defendant flooded the market with false representations, were not victims of his crime.  As the Seventh Circuit held in an analogous market manipulation scheme: "The reality remains that his trades injured those who traded with him; these parties were always harmed by the artificial shift in market price."  *Coscia*, 866 F.3d at 802.

Defendant, however, suggests that his crime was victimless.  First, Defendant contends that only individuals who testified at his trial may be considered "victims."  In general, a "victim" is a person who suffered an "actual loss" or an individual who "sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1 Appl. n.1.  Moreover, courts have held under similar circumstances that individuals who purchased a security during the time period it was being manipulated are victims under the sentencing guidelines.  *See, e.g.*, *Parris*, 573 F. Supp. 2d at 748–49 (finding more than 250 identifiable victims based on fact that over 500 individuals purchased security during pendency of fraudulent scheme to artificially inflate volume); *see also Coscia*, 866 F.3d at 802.  The thousands of individuals who lost money trading HYDRO on Bittrex during the relevant time period suffered actual losses as a result of Defendant's scheme, and they are all victims.  At bare minimum, the ten individuals identified by their initials in the PSR suffered "actual losses" as a result of Defendant's criminal conduct and those losses are identified in the PSR.  Nothing more is required to support this enhancement.  *See, e.g.*, *United States v. Graveran-Palacios*, 835 F. App'x 436, 445 (11th Cir. 2020)

(affirming district court's application of ten-or-more victim enhancement where "PSR identifies the . . . victims of the conspiracy and states the loss amount for each").

Second, Defendant makes the unsupported suggestion that some unknown number of the ten specific individuals identified by the United States for the US Probation Office may have been the alter egos of Defendant's co-conspirator, Tyler Ostern.  The ten specific victim names provided by the United States, as well as at least another 400 plus for whom the United States obtained KYC information from Bittrex are very much real people.  Indeed, two of them testified at Defendant's trial and others have begun submitting victim impact statements to the Department of Justice in the wake of Defendant's crime.  Defendant's suggestion that these individuals, who lost a combined $137,000, were in fact alter egos of his own co-conspirator, allegedly trading and losing money against his own bot, is not credible.

### D.  Defendant Does Not Qualify for a Two-Point Reduction Under 4C1.1

If the Court agrees with the government and Probation regarding Defendant's aggravating role, he does not qualify for the zero-point offender reduction.  Section 4C1.1 of the Guidelines provides that, *inter alia*, an offender who receives an aggravating role adjustment under § 3B1.1 does not qualify for the reduction.

Defendant contends that, even if he receives an aggravating role enhancement, he may still qualify for a reduction under § 4C1.1.  Not so.  Section 4C1.1 plainly states that a defendant qualifies for the reduction only if he "meets all of the following criteria."  The last of these criteria is that the defendant "did not receive an adjustment under §3B1.1 (Aggravating Role) **and** was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848."  U.S.S.G. § 4C1.1(a)(10).  In other words, Defendant has the burden to show that he did not receive an aggravating role adjustment *and* to show that he was not engaged in a continuing criminal enterprise.  If he fails to make either one of these showings (or any of the other nine requirements contained in 4C1.1(a)), he is not entitled to the

reduction.  *See, e.g.*, *United States v. Miguel Rodriguez-Orejuela*, Case No. 03-cr-20774, Order Denying Motion for Two Level Reduction, D.E. 338 (Nov. 16, 2023) ("Defendant is excluded from benefiting from [the 4C1.1] reduction because he received a four level enhancement for his role in the offense.").  Defendant's reading flips this text on its head.  According to Defendant's reading, if any one of the ten requirements does not apply to him, he is entitled to the reduction.  This is a patently incorrect reading of the plain language of § 4C1.1.

Moreover, as the PSR correctly notes, the U.S. Sentencing Commission has clarified that it intended § 4C1.1(a)(10) to exclude any defendant who received an aggravating role adjustment *or* was engaged in a continuing criminal enterprise.  In a December 2023 proposed technical amendment, the Commission stated that it "intended §4C1.1(b)(10) to track the safety valve criteria at 18 U.S.C. § 3553(f)(4) and be applied by courts in the same way—namely, that a defendant is ineligible for the adjustment if the defendant meets either of the disqualifying conditions in the provision."  Ex. E, Proposed Amendments to the Sentencing Guidelines, at 89 (U.S. Sent'g Comm'n 2023).  In the amendment, the Commission proposes splitting §4C1.1(a)(10) into two separate provisions to remove any confusion regarding its interpretation.  Accordingly, under no circumstance is Defendant entitled to this reduction.

<u>**CONCLUSION**</u>

For the reasons set forth above, the United States respectfully recommends that the Court sentence defendant to a Guidelines range term of imprisonment based on a total offense level of 29.

Respectfully submitted,

GLENN S. LEON, Chief
U.S. Department of Justice
Criminal Division, Fraud Section


*/s/ Andrew Jaco*
ANDREW JACO, Trial Attorney
Fla. Special Bar. ID: A5503040
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, D.C. 20005
Phone:   (202) 740-0953
Email:   andrew.j.jaco@usdoj.gov

Scott Armstrong, Assistant Chief
Fla. Special Bar ID. A5502972
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington D.C. 20005
Phone:    (202) 355-5704
Email:    scott.armstrong@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June 18, 2024, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

s/Andrew Jaco
J. Andrew Jaco
Trial Attorney
