**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 23-CR-20172-SEITZ**

UNITED STATES OF AMERICA,

v.

SHANE HAMPTON,

      Defendant.

_____/

**DEFENDANT SHANE HAMPTON'S SENTENCING MEMORANDUM,**
**MOTION FOR DOWNWARD DEPARTURE AND VARIANCE, AND**
**REQUEST FOR RDAP RECOMMENDATION[1]**

---

[1] Pursuant to this Court's order on June 18, 2024, ECF No. 188, Defendant was granted leave to file a sentencing memorandum up to thirty pages. Pursuant to Local Rule 5.1(a)(4) one and one-half point spacing is used.

Defendant Shane Hampton respectfully submits this Sentencing Memorandum, Motion for Downward Departure and Variance from the United States Sentencing Guidelines, and Request for RDAP Recommendation. Mr. Hampton asks the Court to impose a sentence substantially below the advisory guidelines range that is reasonable and not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a).

## INTRODUCTION

There are compelling reasons to sentence Mr. Hampton substantially below the calculated Guidelines offense level. Mr. Hampton appears before this Court for sentencing after having been convicted by a jury of two criminal offense: one count of conspiracy to commit wire fraud and one count of conspiracy to commit securities fraud and having been acquitted of two charged offenses: two substantive wire fraud counts. The U.S. Probation Office ("Probation") has calculated, under the U.S. Sentencing Guidelines ("Guidelines"), an offense level of 30, with a criminal history category of I, leading to an advisory Guidelines range of 97 to 121 months' imprisonment.

Mr. Hampton is a first-time offender who has no prior incidents with the law. Indeed, apart from this offense, Mr. Hampton has led an exemplary life, working hard, striving for academic and professional excellence, and devoting his generosity, kindness and talents in service of his family, friends, colleagues and often even strangers. And while the offense at issue is a serious one, it is not one that warrants a decade of imprisonment, particularly when comparing Mr. Hampton's role to that of others involved in the offense who received sentences dramatically lower. The below discussion demonstrates why a sentence substantially below the Guidelines is appropriate.

## STANDARD

Whether through specific departures or the ability to grant a variance, this Court has broad discretion to craft an appropriate sentence for Shane. The Sentencing Guidelines are "merely advisory, and the Court is not bound to apply the sentence indicated by the Guidelines so long as they are first determined and then carefully considered." *United States v. Gibson*, 442 F. Supp. 2d 1279, 1282 (S.D. Fla. 2006). To calculate the Guideline range, the Court must determine whether to permit an adjustment for the defendant's role in the offense and whether to permit a departure from the defendant's criminal history category. *See* U.S.S.G. § 1B1.1(a)(3), (6).

At the outset, when determining Mr. Hampton's advisory guideline range, the Court should not impose the role enhancement recommended by the PSI or the victim enhancement and should

find a significantly lower loss amount calculation than proposed by the government.  Furthermore, the court should apply the two-level reduction for zero point offenders under §4C1.1. Beyond that, the Court should depart downward under §5C1.1 Application Note 10(b) for first time nonviolent offenders and further reduce the sentence significantly for aberrant behavior, the gross disparity that would result otherwise, and the important role Mr. Hampton plays in caring for his mother, brother and wife.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007). Here, the application of this tradition yields compelling bases for either a departure or variance under a number of factors.

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of the statute. In conducting its analysis, the Court considers the advisory sentencing range recommended by the Guidelines and any relevant Guideline policy statements, as well as other traditional sentencing factors, such as: (1) the nature of the offense and history and characteristics of the defendant; (2) the purpose of sentencing; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

The Court should impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in each case. *Gall v. United States,* 552 U.S. 38, 49 (2007)*.* The Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47. In this case, the 3553(a) factors discussed below, weigh heavily in favor of the Court exercising its broad discretion to impose a sentence substantially below the advisory Guidelines range.

## OBJECTIONS TO THE GUIDELINES AND DEPARTURES

### I.     The Guidelines Calculation Should Not Include a Role Enhancement.

The PSI erred in recommending a 3-level enhancement based on Shane's role.

The government bears the burden of proving by a preponderance of the evidence that a defendant qualifies for a role enhancement under the U.S. Sentencing Guidelines. *United States v. Martinez*, 584 F.3d 1022, 1026-27 (11th Cir. 2009). To qualify for a 3-level enhancement under

Section 3B1.1 of the Guidelines "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. §3B1.1(b) cmt. n.2. It is not sufficient, however, that the defendant supervised other participants in the conspiracy in their *non-criminal* activities. *United States v. Dominguez*, 616 Fed. App'x 905, 909 (11th Cir. 2015).

The PSI conflates Mr. Hampton's unrelated job duties at Hydrogen with offense conduct necessary to support a role enhancement. In justifying the role enhancement, the PSI notes that Mr. Hampton was the "Chief [sic] of Financial Engineering at Hydrogen Technology and acted as a senior staff member at Hydrogen Technology from November 2017 to December 2018." PSI at ¶ 51. The trial evidence demonstrated, however, that as Head of Financial Engineering, Mr. Hampton focused on the API operations of Hydrogen, which had nothing to do with HYDRO or the offense at issue. The evidence also established that although Mr. Hampton had a supervisory title, he was not on Hydrogen's Board of Directors and was an employee who could not make company decisions without the approval and authorization of Mr. Kane or his brother Matthew Kane, the founders and owners of Hydrogen *See* Trial Testimony of Andrew Chorlian, Trial Tr. Vol. II at 49:5, 50:13–16, Ex. 1 (describing Shane as "a software developer" and "maintain[ing] a similar role working on both the financial application that was still running at this time and also eventually worked along side me on the block chain application that we were building." ).

The PSI further states, as a basis for the aggravating role enhancement, that Mr. Hampton "spearheaded Hydrogen Technology's search for a third-party market maker to assist him, Kane, Chorlian and Hydrogen Technology to sell their HYDRO tokens."  PSI at ¶ 51. Mr. Hampton's involvement in the search for a market maker, however, cannot form the basis for a role enhancement because: 1) the search for a market maker was a search for a *legal* market maker; 2) Mr. Hampton did not lead the search; and 3) Mr. Chorlian was as involved in the search as Mr. Hampton and he did not receive a role enhancement.

The Court, the government, and Mr. Hampton have agreed, since before the trial commenced, that "the mere hiring of a market maker" was not, "by itself, illegal or wrongful." *See* ECF No. 90, p.3 (granting Mr. Hampton's uncontested motion to "preclude argument that the mere hiring of a market maker was, by itself, illegal or wrongful"). At trial, Mr. Chorlian repeatedly stated that when he and Mr. Hampton, at Mr. Kane's direction, participated in efforts to find a market maker, they were searching for a market maker that could employ *legal* market making operations. *See, e.g.* Trial Testimony of Andrew Chorlian, Trial Tr. Vol. III at 118:11-16, Ex. 2

3

(Q: You were not trying to suggest, hey let's try these other illegal market making firms? A: No, I was not. Q: Everybody's talking about legal things here, right? A: Yes.)

The Court even curtailed this line of testimony as irrelevant. *See id.* at 122:1-2, 123:10-11, 15-17 (Court: "Can we focus in on what we really need to know. We're not in the business of looking for market makers."; sustaining objections to several follow up questions); *see also id.* 131:22-24 ("AUSA Jaco: I also think this continues to present a 403 issue, the continue[d] issue of the market makers other than Moonwalkers").

Instead, what the evidence showed is that it was Mr. Kane who directed both Mr. Hampton and Mr. Chorlian to search for a market maker. At trial Mr. Chorlian acknowledged that Mr. Kane directed *both* him and Mr. Hampton to look into market makers. *See id.* at 99:8-11, Ex. 3 ("Q: Mr. Chorlian, you, Mike—well, primarily you and Shane were directed by Mike to find a market maker, right? A: Yes."). Thereafter, Mr. Chorlian, Mr. Hampton, and Mr. Kane were all involved in searching for a market maker and in creating a spreadsheet where all three could add information about the various market making companies they were researching. *See* Unadmitted DX 55-DOJ-PROD-0000014020, Ex. 4*; see also* DX 113/253 at 7, Ex. 5 (excerpt of the Kane-Hampton-Chorlian Slack posting the shared google drive spreadsheet of potential market makers.).

But it was Mr. Chorlian who first met with Moonwalkers, learned about the illegal tactics of the Moonwalkers bot, and recommended Moonwalkers to Mr. Kane and Mr. Hampton, claiming that Moonwalkers had a "robust" bot. *See* GX 505, Ex. 6. And, *after* learning about the bot's illegal functions, it was Mr. Chorlian who on numerous occasions insisted that Moonwalkers should be considered as an option. For example, on August 20, 2018, Mr. Chorlian discussed four market makers that he had contacted, but he then noted that "… Moonwalkers reached out again to see what we wanted to do." DX 113/277 at 1-2, Ex. 7. On September 27, 2018, when Mr. Kane messaged "@Shane we should hire 1-2 of the algorithmic trading firms for Oct 1 or try to add something ourselves," DX 114/20 at 1, Ex. 8, Mr. Hampton responded "We have 2 real options: HedgeTech and Pacific block. They essentially provide the exact same services." *Id.* In the same minute, Mr. Chorlian responded "Moonwalkers emailed me again yesterday, just forwarded to you guys, said they revised their pricing." *Id.* at 1-2. Days later, when Mr. Kane directed Mr. Hampton to recommend a market maker, Mr. Hampton stated Moonwalkers had the best bot, but it was Mr. Kane who made the ultimate decision about whether and which market maker to hire. PSI at ¶ 50.

Thus, while Mr. Hampton signed the agreement with Moonwalkers, it was only at the

direction and under the supervision of Mr. Kane and with the involvement and input of Mr. Chorlian. Mr. Hampton's role in finalizing and signing the agreement does not show decision-making authority sufficient for the enhancement. *See Martinez*, 584 F3d at 1028 ("organizing or coordinating a particular action" or "dealing with the relatively minor details of completing the transaction" does not amount to decision-making authority over anyone in the conspiracy.).

The trial evidence also establishes that Mr. Hampton did not supervise, manage or direct Mr. Ostern. Mr. Ostern was the President and Chief Executive Officer of Moonwalkers and it was Mr. Ostern, in conjunction with his business partner Defendant George Wolvaardt, who designed and developed the Moonwalkers bot for the purpose of committing fraud. They did so before ever meeting with Mr. Hampton or anyone else at Hydrogen. *Compare* GX 202, Ex. 9 (June 5, 2018 telegram chat between Tyler Ostern and George Wolvaardt discussing the design and programming of illegal features into the bot), *and* GX 206, Ex. 10 (June 6, 2018 excerpt from the same chat discussing the same), *with* GX 505, Ex. 6 (August 6, 2018 email from Mr. Chorlian recapping his first meeting with Moonwalkers). And it was Mr. Ostern who pursued Hydrogen so that they would hire Moonwalkers. *See e.g.* DX 113/277 at 1-2, Ex. 7 (Mr. Chorlian messaged on Aug. 20, 2018 "Moonwalkers reached out again to see what we wanted to do"); DX 114/20 at 1-2, Ex. 8 (Mr. Chorlian messaged "Moonwalkers emailed me again yesterday, just forwarded to you guys, said they revised their pricing."). Indeed, in pre-sentence filings with the Court the government refuted Mr. Ostern's false claim that he was recruited. *See* United States Memorandum in Support of Sentencing, *United States v. Ostern*, 23-CR-20165 [DE 22], Ex. 11 ("Defendant's [Ostern's] statement . . . that he was 'recruited into the endeavor . . . is not accurate.").

Once Moonwalkers was hired, Mr. Ostern and Mr. Wolvaardt very much directed and drove the market manipulation activity, acting largely on their own accord and occasionally boasting to Hydrogen about the results of their work. The Moonwalkers-Hydrogen Slack channel, GX 1, Ex. 12, supports this characterization of the relationship. When Mr. Ostern was asked at trial "how did you use this chat after you were retained by Hydrogen?," he responded "To communicate what we're doing, status up dates, et cetera." Trial Testimony of Tyler Oster, Trial Tr. Vol IV at 102:24-25-103:1-2, Ex. 13. The chat supports this, with Mr. Ostern frequently providing updates on the strategies and progress of their activity. *See* GX 1, Ex. 12.

Mr. Hampton's input on the chat was limited. He rarely engaged in discussions with the group or responded to Mr. Ostern's comments and questions. In one exceptional exchange,

wherein Mr. Ostern described his approach going forward, Mr. Hampton responded that that "[w]e try to not get involved in any talks involving trading on our telegram or social media" and that "spending some txn fees is fine." GX 1 at 15, Ex. 12. These two statements by Mr. Hampton do not establish that Mr. Hampton controlled, managed or supervised Mr. Ostern or Moonwalkers.

Indeed, Mr. Chorlian, who did not receive a role enhancement, responded two messages later in this same thread stating "Yeah, I don't think there is an issue with anyone else directing people there." *Id.* And Mr. Chorlian provided other feedback and direction to Mr. Ostern and Moonwalkers, which the Court deemed insufficient for a role enhancement. For example, in a Moonwalkers Slack channel exchange on October 30, 2018, Mr. Ostern explicitly asked "In other respects though, how are we doing? Any complaints? Criticisms? Praise?" *Id.* at 19. Tellingly, it is Mr. Chorlian, not Mr. Hampton, who responded by stating "Good job with the redirection to the supporters channel. [thumbs up]. As far as how you can help, we already were approved and now they are discussing price…How do you think you would be able to help with that?" *Id.* At trial, when Mr. Chorlian was asked "…who was involved in the tactics that Moonwalkers ultimately used?," he responded "Myself and Shane and Mike and Moonwalkers." Trial Testimony of Andrew Chorlian, Trial Tr. Vol. III at 173:23-25, Ex. 14. Thus, the evidence and trial testimony demonstrate that Mr. Ostern and Moonwalkers were not managed, supervised or controlled by Mr. Hampton. *See United States v. Valenzuela*, 635 F. App'x 568, 571 (11th Cir. 2015) (holding the application of an aggravated role enhancement inapplicable when the participants are "on a relatively equal footing").

Mr. Hampton's limited involvement in facilitating payments to Moonwalkers does not justify a role enhancement. While Mr. Hampton did assist in facilitating payment to Moonwalkers in a couple of instances, on numerous occasions, it was Mr. Chorlian who executed the payment to Moonwalkers. *See, e.g.* GX 1 at 22, Ex. 12 (Mr. Chorlian sends 50 million HYDRO tokens to Moonwalkers); *id.* at 27 (Mr. Chorlian sends Moonwalkers the November 2018 payment); Trial Testimony of Andrew Chorlian, Trial Tr. Vol. II at 156:2-3, Ex. 15 ("Q: Did you pay them Bitcoin? A: Yes."). Second, the jury acquitted Mr. Hampton of the two substantive wire fraud counts, so this conduct should not be held against him as related conduct or otherwise. *See* U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines, Nov. 1, 2024, https://www.ussc.gov/sites/default/files/pdf/amendmentprocess/official-text-amendments/202405_Amendments.pdf (amending Section 1B1.3 to exclude acquitted conduct

from consideration as relevant conduct).

Mr. Chorlian received the same share of HYDRO tokens as Mr. Hampton (which he, unlike Mr. Hampton, sold for a massive profit during the conspiracy period), and exercised a similar level of decision-making ability as Mr. Hampton, making recommendations and providing input to Mr. Kane with respect to the hiring, use and payment of Moonwalkers. Indeed, as noted in the PSI, the SEC determined that Mr. Chorlian and Mr. Hampton were lower-level participants in the misconduct while Mr. Kane and Mr. Ostern directed and were principally responsible for the misconduct. For that reason, the SEC fined Mr. Kane, Mr. Ostern and Hydrogen Technology but did not pursue any penalties against Mr. Hampton or Mr. Chorlian. PSI at ¶ 45.

Applying a role enhancement to Mr. Hampton would also create an unwarranted disparity between Mr. Hampton and Mr. Ostern, the CEO and President of Moonwalkers who designed and created the bot at issue, wrote the contract between Moonwalkers and Hydrogen, and directed and managed employees at Moonwalkers, but did not receive any role enhancement. And a two-level enhancement would place Mr. Hampton on the same level as Mr. Kane—the CEO of Hydrogen who received five times the coin allotment of Mr. Hampton and Mr. Chorlian, and who supervised and managed Mr. Hampton, Mr. Chorlian, and Mr. Ostern throughout the period of the conspiracy. The application notes to §3B1.1 explicitly states that "this adjustment is included primarily because of concerns about relative responsibility," and Mr. Hampton had far less responsibility than Mr. Kane and no greater responsibility than Mr. Chorlian or Mr. Ostern. *See* U.S.S.G. §3B1.1(b) cmt. *Background*.

Mr. Hampton should not be the exceptional case where the enhancement is applied. According to the United States Sentencing Commission's Sourcebook ("USSC Sourcebook"), FYE 2023, a three-level or four-level role enhancement was only applied in 2.4% of all federal cases sentenced last year. USSC Sourcebook, FYE 2023, at Table 21. The two-level role enhancement was only applied in 1.8% of federal cases. *Id.* Further, applying even a two-level could functionally serve as a four-level enhancement for Mr. Hampton if this Court also finds that applying the enhancement renders Mr. Hampton ineligible for the two-level zero-point offender reduction he otherwise qualifies for under section 4C1.1.

In sum, this Court should not apply the role enhancement to Mr. Hampton because he did not manage, lead, or organize criminal activity by others and because applying the enhancement to Mr. Hampton would create an unwarranted disparity between him, Mr. Chorlian and Mr. Ostern.

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

II.    **Loss Under §2B1.1**

The government seeks an increase of 16 levels based on "a loss greater than $1,500,000, but not necessarily $2,000,000." PSI ¶ 51. For the reasons discussed below, the Court should reject the government's argument that loss is incalculable and that a gain greater than $1,500,000 should determine the applicable guidelines level enhancement. Instead, the Court should find that loss is the appropriate measure to be applied, and that loss is no greater than $33,753.68. In the alternative, if the Court determines that gain is the appropriate measure, then the Court should find that the gain attributable to the conspiracy is no greater than $95,000.00.

a.    **Loss is the Appropriate Measure**

U.S.S.G. § 2B1.1(b)(1)(A)-(P) permits an increase of a defendant's offense level based on the amount of loss inflicted by the crime. The government's desire to rely on gain stems from guidelines *commentary*, which seemingly permits a court to rely on gain as an alternative "*only if there is a loss but it reasonably cannot be determined.*" U.S.S.G. § 2B1.1 cmt. n. 3(B); *see also United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002) (finding that the "trial court erred when it found calculating the loss to victims was not feasible").

But the government's ability to rely on Guidelines commentary was significantly curtailed by the Eleventh Circuit's *en banc* decision in *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023). Guided by the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. 558, 139 S. Ct. 2400, 204 L. Ed. 2d 841 (2019)—which limited an agency's interpretation of its rules to only situations where the rule or regulation is ambiguous—the *en banc* panel held that a sentencing court may turn to the guidelines commentary only when the plain language of the guideline is ambiguous. *Dupree*, 57 F.4th at 1276-77.

Following the Eleventh Circuit's decision in *Dupree,* United States District Court Judge Rodolfo Ruiz examined the impact of the decision on the commentary to U.S.S.G. § 2B1.1. *United States v. Patel*, No. 19-CR-80181-RAR, 2023 WL 5453747, at *1 (S.D. Fla. Aug. 23, 2023). In *Patel*, the government requested that the Court calculate loss based "intended loss," relying on Application Note 3(A)'s commentary that "loss is the greater of actual loss or intended loss." *Id.* at *1. The government specifically contended that "the meaning of loss is ambiguous" and that recent Eleventh Circuit caselaw endorsed using intended loss rather than actual loss when applying § 2B1.1. *Id.* at *2. Judge Ruiz rejected both arguments, noting that the Third Circuit recently determined that "loss only has one possible meaning: actual loss," and stating that "the Eleventh

Circuit's mandate in *Dupree* is clear." *Id.* at *2-3. Thus, because "loss" is unambiguous, the Court cannot turn to the Guidelines commentary in calculating loss. *Id.* Accordingly, under *Dupree*, the Court cannot rely on gain as a proxy.

### b. Even if the Court Determines that "Loss" is Ambiguous and the Commentary Applies, the Government Cannot Satisfy its Burden to Shift to Gain.

The commentary to the Guidelines permits the Court to rely on gain only if (1) there is an actual loss; and (2) loss cannot reasonably be determined. U.S.S.G. § 2B1.1 cmt. n. 3(B); *see United States v. Bazantes*, 978 F.3d 1227, 1250 (11th Cir. 2020) ("There is nothing ambiguous about 'only if'"). Even if the government were able to establish the first requirement[2]—an actual loss—there has been no evidence supporting its contention that loss cannot reasonably calculated.

In other, similar cases, the government has been able to reasonably calculate loss. *See United States v. Stein*, 846 F.3d 1135, 1139 (11th Cir. 2017) ("*Stein I*") and *United States v. Stein*, 964 F.3d 1313, 1317 (11th Cir. 2020) ("*Stein II*") (calculating loss in case involving mail, wire, and securities fraud based, in part, on fabricating purchase orders to inflate a stock price). Mitchell Stein was convicted of mail, wire, and securities fraud related to inflating the value of a security by drafting press releases discussing sales, which were supported by "fake orders from fake companies [that] never occurred." *Stein II*, at 1317. The Eleventh Circuit reversed the initial sentence, which found a loss of "more than $50 million but less than $100 million" based on the lack of evidence establishing that each of the 2,145 investors relied upon the fabricated information in making their decision to invest—i.e., factual causation; and based on the fact that the court did not consider intervening events, such as "the across-the-board stock market decline of 2008" and "the short selling of over 22 million shares"—i.e., legal causation. *See generally Stein I*, pp. 1144, 1153-55. On remand, the government presented an expert and the district court found that 616

---

[2] The government is *obligated* to seek restitution from all defendants under the Mandatory Restitution Victims Act ("MVRA"). Relevant here, calculating actual loss "under the Sentencing Guidelines is 'largely the same' as the method for establishing actual loss to identifiable victims under the [MVRA]." *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) (quoting *United States v. Cavallo*, 790 F.3d 1202, 1239 (11th Cir. 2015)). By not seeking a single penny of restitution from Mr. Ostern or Mr. Chorlian the government has conceded that there is no loss attributable to this conspiracy. Any argument to the contrary acknowledges, at best, an abdication of the government's mandatory obligation to seek restitution from every defendant or, at worst, vindictiveness based on Mr. Hampton's exercise of his constitutional rights.

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

investors suffered losses in the amount of $1,029,570—an amount at least 50 times less than that argued by the government at the original sentencing. *Id.*

The cases cited by the government are unpersuasive and inapplicable. The government searches long and far for cases to support its position, landing in every jurisdiction except for the Eleventh Circuit. In contrast to the government's cases,[3] courts can, and in the Eleventh Circuit regularly do, calculate loss in securities manipulation cases. For example, in addition to *Stein*, in *United States v. Schneider*, 853 F. App'x 463 (11th Cir. 2021), the district court calculated loss arising from a seven-year "pump-and-dump swindle" involving "fraudulently inflating the company's stock price" through "false and misleading press releases," among other means, and "selling the company's shares to innocent investors for substantial financial gain." For this scheme, far more analogous to the scheme present in this case than the those relied on by the Government,[4] and arising in the Eleventh Circuit, the court was able to, and did rely on loss rather than gain.

The government's argument that using "gain as a measure of loss is in fact favorable to Defendant as it results in a more conservative estimate of loss than other methods available to the

---

[3] The cases cited by the government are unpersuasive; many of the cases are misleadingly or inaccurately portrayed: In *United States v. Abouammo*, No. 19-CR-00621-EMC-1, 2022 WL 17734424, at *1 (N.D. Cal. Dec. 16, 2022) the Court applied a loss analysis method explicitly rejected by the Eleventh Circuit in *Dupree*, 57 F.4th at 1275. Neither *United States v. Anwar*, No. 20-30205, 2022 WL 777212 (9th Cir. Mar. 14, 2022) nor *United States v. Mirando*, No. 19-50384, 2021 WL 4947330 (9th Cir. Oct. 25, 2021), relied on gain instead of loss, failing to mention gain once. Rather, because the defendants accepted money for services which were not provided or were only partially provided, the court was able to determine loss based on evaluating how much money the defendant received. In *United States v. Randock*, 330 F. App'x 628, 629 (9th Cir. 2009), the potential loss to consumers and employers who hired or interacted with individuals who used fraudulent academic credentials sold to them by the defendant could not reasonably be calculated. While the court in *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007), acknowledged that "measurement of loss becomes considerably more complex . . . when the court confronts a 'pump-and-dump' scheme involving an otherwise legitimate company," the government still attempted to prove loss and the court remanded the matter because the government's methodology was inappropriate—not because gain should have been used as a proxy. *United States v. Parris*, 573 F. Supp. 2d 744, 746 (E.D.N.Y. 2008) is sufficiently dissimilar and there is no discussion about the information available to the government in 2008.

[4] For example, the government cites *United States v. Gordon*, 710 F.3d 1124, 1128 (10th Cir. 2013) and argues that its facts "involve[e] a scheme similar to that at issue here." Yet, *Gordon* contained several layers of complexity, including the manipulation of four *different* stocks and back dated documents, which are absent from the present scheme and more analogous schemes where courts calculated loss. *Id.* at 1128.

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

Court," [ECF No. 187, p. 11], is a strawman argument because the proposed "less conservative" measures the government offers all rely on flawed methodologies. The first two methods ask the Court to simply calculate loss of individuals without any consideration of market factors or factual and legal causation—a method uniformly rejected by appellate courts throughout the country.

For the third method, the government offers the "recission method," which stems from guideline commentary. However, the government misapplies this theory. Factually, the government overstates the number of outstanding shares, ignores the fact that many of the tokens were distributed for free, and ignores the fact that the tokens could be consumed. Finally, the government ignores the requirement that the court consider market factors. *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(ix). In summary, the government fails to apply any level of critical thinking to these "less conservative" theories, rendering them improper and meritless.

Indeed, Jeremy Cusimano has already shown that loss can be calculated. While the government has claimed an inability to calculate loss, an expert has conducted an analysis of the relevant records and reached a reasonable loss calculation. *See* Cusimano Report. Mr. Cusimano, a former Economic Advisor to the Director of Enforcement at the U.S. Commodity Futures Trading Commission and Chief Economist for Petroleum Reserves at the U.S. Department of Energy, engaged in the same type of detailed analysis accepted by United States Senior District Court Judge Kenneth Marra, *see USA v. Stein*, 11-cr-80205-KAM-1 (S.D. Fla.) and affirmed by the Eleventh Circuit in *Stein II*.

In contrast, the government has not presented a single witness, let alone an expert, qualified to offer an opinion on this issue, who can establish that loss cannot reasonably be calculated in this case. The mere fact that the government does not want to put forward the effort necessary to evaluate the data does not mean that it cannot reasonably do so.

### c.   The Court Should Apply No Loss or a Loss of $33,753.68

The Court should find that the government has failed to offer a reasonable estimate of loss and that therefore no loss enhancement applies. A reasonable calculation of loss would lead to a four-point increase in the offense level because loss is more than $15,000.00 but less than $40,000.00.

In his expert report, Mr. Cusimano properly relies on factors approved by the Eleventh Circuit in evaluating loss related to circumstances that involve more than simple theft of property. To begin, Mr. Cusimano applies *Stein I's* but-for requirement to determine inducement to

appropriately determine the investors to include in the loss analysis while excluding investors who were clearly not induced by the fraud. Cusimano Report at ¶¶ 35-36. Cusimano used conservative assumptions which still "overstates the potential number of accounts that could have been induced to trade and therefore potentially harmed by the Moonwalkers market activity." *Id.* at ¶ 36.

To calculate loss, Mr. Cusimano first calculated the gains or losses of investors who sold all of their HYDRO. *Id.* at ¶ 37. When the data was incomplete and did not contain a corresponding sale for an investor, Cusimano incorporated an averaged matched position based on the average market price on April 10, 2019, following the end of any manipulation by Moonwalkers. *Id.* Using this method and extrapolating the process to encompass all the data, Mr. Cusimano was able to determine that the maximum potential loss caused by Moonwalkers' manipulation is $33,753.68. *Id.* at ¶ 38.

Mr. Cusimano also examines the legal cause of any harm, as required by *Stein I*, noting the myriad of extrinsic factors that contributed to HYDRO's decrease in value. First, while Moonwalkers was active, the broader cryptocurrency market was in decline. ¶ 40. And the value of many cryptocurrencies, including HYDRO, was tied to the value of Bitcoin ("BTC"). During the same period of time that Moonwalkers was active, BTC declined by 21%, including a 39% decline between October 2018 and January 2019, when HYDRO's decline was greatest. *Id.* at ¶ 30; *see also* Figure 3. In addition, Mr. Chorlian's massive sale of his tokens in a short period of time contributed to the decline of the market. *Id.* at ¶ 42. During the six-month span that Moonwalkers was active Hydrogen sold a net of approximately 476.9 million tokens. Meanwhile, on February 11, 2019, alone, Mr. Chorlian sold 95,313,364.78 tokens, which is approximately 20% of the amount Hydrogen sold in six months. *See* DX 136a, Ex. 17; *see also* Chart 4, Ex. 18.

Put simply, it is possible to calculate loss and an expert has done so. Specifically, based on these calculations, which evaluate both necessary types of causation, the Court should impose only a four-level increase based on a loss of more than $15,000.00 but less than $40,000.00.

### d. Even if the Court determines that "gain" is the appropriate measure, the government vastly overstates the gain attributable to the conspiracy

The PSI recommends a sixteen-point offense level enhancement based on a gain of more than $1,500,000. The government's gain assessment cannot be relied upon because it is based on (1) flawed methodology; (2) flawed data; and (3) inconsistent positions.

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

### i.  Flawed Methodology

To arrive at a gain number greater than $1,500.000, the government subtracts the monetary value of the tokens Mr. Kane purchased from the monetary value of the tokens Mr. Kane sold and treats the difference as "net profits" *See* [ECF No. 166-6, ¶ 10]. But that approach, which considers all gains rather than those gains attributable to the Moonwalkers manipulation, is unacceptable under the Guidelines and the case law.

It is indisputable that HYDRO had a monetary value and market value independent of Moonwalkers' manipulation. *See* Chart 1. Indeed, there were over 75,000 purchase and sale orders of HYDRO in the periods before and after Moonwalkers' involvement, with more than $20,000,000.00 worth of HYDRO exchanged. *Id.* But the government ignores that reality in favor of a simplistic net profit approach that has already been rejected by appellate courts.

In *United States v. Nacchio*, 573 F.3d 1062, 1070 (10th Cir. 2009), for example, the Tenth Circuit reversed the district court's gain calculation following a conviction for insider trading and explained that gain must be based on a "realistic, economic approach (1) that [takes] into account that [the] offense [does] not inhere in [the] sale of the shares itself, but in the *deception* intertwined with the sales . . ., and (2) that consequently would endeavor to compute his gain for sentencing purposes based upon the gain resulting from that deception." (emphasis in original). In reaching this conclusion, the Tenth Circuit chastised the district court for "its focus on the net profit [the defendant] received from trading in securities during the fraud period [which] effectively ignored the myriad of factors unrelated to his criminal fraud that could have contributed to the increase in value of the securities." *Id.* at 1074; *cf.* 4 Thomas Lee Hazen, The Law of Securities Regulation § 12.12[3], at 195 (6th ed. 2009) ("When dealing with publicly-traded securities, many factors exist during the period in which violations take place that may affect the market price of the securities. These factors include general market or financial conditions, industry-wide conditions, or issuer problems unrelated to the violations in question. In these situations, courts try to establish the *value of the defendant's misrepresentation.*" (emphasis added and footnotes omitted)).

In another criminal securities fraud case, the Fifth Circuit reversed the defendant's sentence based on the district court's failure to recognize that stock price movements based on factors unrelated to the defendant's offense should be excluded from a Guidelines loss determination. *See United States v. Olis*, 429 F.3d 540, 545–49 (5th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005)). In reaching this conclusion,

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

the Fifth Circuit commended the Eleventh Circuit's decision in *Snyder*, 291 F.3d 1291, which "[took] seriously the requirement to correlate the defendant's sentence with the actual loss caused in the marketplace, exclusive of other sources of stock price decline." *Id.* at 547.

Under a proper gain analysis, which identifies the gain attributable to the offense conduct, a vastly different calculation emerges. For example, using a methodology similar to that employed by Cusimano which accounts for the value of HYDRO tokens apart from the fraud based on the value of HYDRO before and after the manipulation, results in a gain attributable to the manipulation of $179,153.18. *See* Chart 2, Ex. 20 (showing the average value of Hydro with and without Moonwalkers); Chart 3, Ex. 21 (summary of HYDRO transactions from Kane's account during Moonwalkers). Accounting for the effect of Mr. Chorlian's fire sale on the average HYDRO price, further reduces the gain attributable to Moonwalkers' activity to $96,299.54. *See* Chart 4, Ex. 18 (displaying the effects of Chorlian's trade on the HYDRO price); Chart 1, Ex. 19 (Market for HYDRO before and after Moonwalkers).

Given the certainty that the decline in the cryptocurrency market impacted HYDRO's value and the fact that, without accounting for this decrease, the monetary amount is a mere $1,299.54 over the $95,000.00 threshold, if the Court elects to go with gain as a measure of loss, then it should find that the gain is less than $95,000.00.

**ii. Issues with the Underlying Data**

Beyond the flawed methodology, there are two issues with the government's underlying monetary data which inflates the gain calculation: (1) the USD values are internally inconsistent; and (2) the data inappropriately converts USD to BTC in a manner which inflates the USD value.

Little effort has been made to address easily identifiable inconsistencies within the data. For example, there are rounding inconsistencies where the USD is sometimes displayed in thousands and sometimes to the cent, and everything in between. There are also conversion impossibilities, with instances where the calculated USD value for sales is the same despite the stated BTC value being several thousand dollars different. *See* Chart 5, Ex. 22 (demonstrating 17 transactions for the sale or purchase of the same amount of HYDRO, all displayed in whole thousands, and including three transactions on October 30, 2018 with the same calculated USD value of $48,000.00, despite the value of BTC increasing by 1.2% between transactions).

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

Finally, the USD amount overstates the possible BTC value at the time of the transaction. For example, the daily USD high for BTC on October 30, 2018 was $6,364.99.[5] Thus, if these two 10,000,000 sales occurred at the daily high, then the maximum the 6:31 sale could have been worth would be $46,448.36 and the maximum that the 6:33 sale could have been worth would be $47,100.92. In summary, during just these two transactions, the government's data attributes approximately an additional $2,400 in gain than possible in the even most favorable circumstances.

### iii.  The Government's Inconsistent Positions

The government had access to the same data before the sentencing of all codefendants. Yet, the government attributed a loss/gain of $1.3 million to the cooperating defendants, Mr. Chorlian and Mr. Ostern—two individuals who profited from the market manipulation—while insisting that the losses applicable to Mr. Hampton are greater than $1.5 million. *See* PSI ¶¶ 52, 53 Notably, the government still contends that George Wolvaardt is accountable for only a $1.3 million loss/gain. *See id.* at ¶ 53 (the government is only attributing a $1.3 million loss amount to Mr. Wolvaardt).

In other words, despite there being five individuals accused of the same conspiracy and despite the fact that all individuals except for Mr. Hampton *personally* profited from the conspiracy, the government is selectively choosing to advocate for a higher loss amount against Mr. Hampton, just enough to increase his offense level. There is no new evidence justifying this disparity. The only difference between Mr. Hampton and the others for whom the government sought a 1,300,000.00 loss is that Mr. Hampton exercised his constitutional rights.

## III.  Number of Victims Under §2B1.1

The government's request for a two-level enhancement on the basis that there are ten or more victims should not be applied because (1) the government cannot meet its burden to establish that these ten individuals are victims of the conspiracy; and (2) the enhancement was not sought against Mr. Ostern or Mr. Chorlian, despite the government having access to the same information.

The Guidelines define a victim as someone who sustained actual loss and apply the same "but for" causation requirements that are applied to loss calculations. *See* U.S.S.G. § 2B1.1, comments n.1 (defining "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)" (emphasis added)) and n.3(A)(i) ("Actual loss" means the "reasonably foreseeable pecuniary harm that resulted from the offense" (emphasis added)).

---

[5]  BTC's historical pricing data can be located at https://coinmarketcap.com/currencies /bitcoin/historical-data/.

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ WWW.GSGPA.COM

The government's list of ten purported victims—identifying them by initials only—is insufficient to justify the enhancement, particularly where the evidence for some victims contradicts the government's claim that the individual is a victim. For example, the government identifies an individual named T.L. as a victim and attributes to him a $8,425.31 loss. The data, however, shows that T.L.—identified as e-mail address tonyluong20@gmail.com—first purchased HYDRO more than a month before the Moonwalkers period and that he *decreased* his trading activity once Moonwalkers was active, showing that he was not induced by the fraud.

Second, the available Bittrex records do not account for approximately 6 million HYDRO tokens that T.L. purchased but did not sell on Bittrex between August 2018 and August 2019. T.L. might have sold that HYDRO on other exchanges, possibly profiting substantially from those sales. Therefore, the government fails to demonstrate that T.L. is a "victim."

Similar problems exist with "B.S.," whose investor email address appears to be haroldrichards@comcast.net. As with T.L., B.S. placed three purchase orders and two sell orders before Moonwalkers began operating—refuting any argument that Moonwalker was the but-for cause of the trading. More importantly, however, are the sales that B.S. made following Moonwalkers' departure. While the government attributes a $6,763.53 loss amount to B.S., this fails to account for the fact that on June 8, 2019, B.S. made two sales of HYDRO, totaling approximately 5,412,040, in exchange for approximately $8,118.06. Put simply, if the government had accounted for B.S.'s sales made outside of the conspiracy period—when HYDRO still had value—it would have realized that those sales outweighed the losses B.S. purportedly suffered during the conspiracy period. When the additional sales are included in the calculation, as of June 8, 2019, B.S. was in the green, had not suffered an actual loss, and cannot be a victim.

Furthermore, the government's selective pursuit of the victim enhancement against Mr. Hampton is improper. The government chose not to seek the enhancement against Mr. Ostern, who discussed the joy he derived from psychologically manipulating the "sheep" or against Mr. Chorlian, who was sentenced following Mr. Hampton's trial and—without-a-doubt—*after* the government had this information. To seek the enhancement against Mr. Hampton, relying on simplistic and flawed data, demonstrates an attempt to violate Mr. Hampton's constitutional rights—a punishment the government seeks because Mr. Hampton chose to go to trial and a *Giglio* violation in that the government did not disclose to Mr. Hampton's defense counsel that it would not be seeking various enhancements against their cooperators that the government believed were

applicable. The guidelines already provide a mechanism to account for the benefit those who plead guilty should receive—the acceptance of responsibility reduction. While it is appropriate to provide that benefit to those who save the government's resources, it is inappropriate to vindictively punish those who seek trial.

**IV.  Mr. Hampton is a Zero-Point Offender and Should Receive a Two-Point Reduction Under §4C1.1 and a Downward Departure as a Nonviolent First Offender under §5C1.1.**

Mr. Hampton meets all of the eligibility criteria and fits squarely within the rationale of the zero-point offender provision. He should receive any one or more of the following: a two-point reduction under §4C1.1; a downward departure under §5C1.1 for nonviolent first offenders who receive a reduction under §4C1.1; or a downward departure or variance in this Court's discretion because Mr. Hampton's lack of criminal history and reduced chance of recidivism independently justify such a reduction.

**a.  Mr. Hampton Qualifies for the Two-point Reduction Under §4C1.1.**

In April 2023, the Sentencing Commission proposed Amendment 821 which provided for a two-level reduction for certain zero-point offenders. In proposing this amendment, the Commission noted that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point" and that " 'zero- offenders' were less likely to be rearrested than 'one point' offenders (26.8% compared point to 42.3%), the largest variation of any comparison of offenders within the same Criminal History Category." *See* U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines, 79, Nov. 30, 2023, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.

Mr. Hampton is a zero-point offender. ECF No. 211 at ¶60. As discussed further below, Mr. Hampton is 32 years old and has led a remarkable life centered around education, hard work, service, and family. In these 32 years, he has not accumulated a single criminal history point. As shown by his actions in the years since the offense--complying with all conditions of his release while finding a new job and developing a skillset for a new career outside of finance—Mr. Hampton poses no risk of recidivism. He not only fits the eligibility criteria, of §4C1.1, but also its rationale.

To the extent it is argued that Mr. Hampton is ineligible for a reduction under §4C1.1 if he receives a role enhancement under §3B1.1, this argument should be moot because, as discussed

above, a role enhancement should not be applied. Even should this court apply a role enhancement, the two-point reduction under §4C1.1 still applies. The plain text of the Guidelines dictates that merely having an aggravating role does not disqualify one from the reduction and several district courts have recognized this and applied the two-level reduction with a role enhancement.[6] *See United States v. Napoleon*, 22-60111 (S.D. Fla.) (applying the two-level reduction under 4C1.1 despite a two-level role enhancement).

**b. The Court Should Depart Downward Under §5C1.1 Because Mr. Hampton is a Nonviolent First Offender.**

In Amendment 821, the Sentencing Commission also added Application Note 10 to §5C1.1 of the Guidelines. U.S.S.G. § 5C1.1 cmt. n.10. Consistent with the Commission's recognition that zero-point offenders are less likely to recidivate, Application Note 10 recognizes that reducing the portion of a sentence comprised of incarceration for nonviolent first offenders who receive a reduction under §4C1.1 is generally appropriate. Specifically, as relevant here, Application Note 10(B) expressly permits departures, including to a sentence other than imprisonment, for offenders receiving an adjustment under §4C1.1 and if the guidelines overstate the offense.

Mr. Hampton is a nonviolent first offender and, as discussed above, should receive an adjustment under §4C1.1. The applicable guideline range overstates the gravity of the offense not only because it is not a crime of violence, but also because, as discussed extensively in this memorandum, it is so much higher than other co-conspirators and overstates the harm. Such a departure, including to impose a sentence other than a sentence of imprisonment, is also merited when considering all of the factors under 18 U.S.C. § 3553(a).

**c. The Court Should Depart or Vary Downward in its own Discretion Due to Mr. Hampton's Lack of Criminal History and Reduced Chance of Recidivism.**

As discussed above, Mr. Hampton should receive a two-level reduction under §4C1.1 and merits an additional departure under §5C1.1. Should the Court, however, decide that Mr. Hampton is ineligible for these provisions, this Court should depart or vary downward due to Mr. Hampton's reduced chance of recidivism. The commentary to Amendment 821 makes clear that the primary justification for the new provisions is the recognition that zero-point offenders pose significantly

---

[6] While the Sentencing Commission has passed an amendment to modify the language such that an aggravating role enhancement alone will be disqualifying under 4C1.1, this does not go into effect until November 2024 and merely highlights that an aggravating role enhancement along is *not* disqualifying under the language of the guidelines as they currently exist.

reduced risks of recidivism. Mr. Hampton's conduct before the present offense, as evidenced by his zero criminal history points, and in the years following the offense, as evidenced by his compliance with all conditions of his pre-trial release and continued efforts to forge a career path to provide for his family, provides concrete evidence that he does not pose a risk of recidivism. Furthermore, even if §4C1.1(10) is meant to exclude defendants who receive a role enhancement generally, Mr. Hampton is not the type of defendant the commission had in mind. The list of exclusions was meant to exclude defendants based on the seriousness of the offense conduct. A "manager or supervisor" working as a mid-level employee in his first job out of college and under the direction of the only boss he has ever known, is not the type of individual intended to be excluded.

Accordingly, even should this Court find that the technical requirements of §4C1.1 and §5C1.1 are not met, it should still exercise its independent discretion to reduce his sentence because the justification for these provisions apply in full force.

**V.   This Court Should Depart Downward Under 5K2.20 or Vary Downward in its Own Discretion Because the Offense Conduct was Aberrant Behavior.**

This Court should depart downward under §5K2.20 or vary downward in its own discretion under the sentencing factors, because the criminal conduct was clearly aberrant and not indicative of the person Shane Hampton is, the life he has lived, or the life he will live going forward. The Guidelines specifically provide for departures for aberrant behavior under §5K2.20 if the defendant committed a "single criminal occurrence or single criminal transaction" that "(1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law abiding life." While Shane qualifies for this departure based on his otherwise remarkable law-abiding life—and note that Mr. Chorlian received such a departure, strongly arguing that the offense conduct meets the requirements—a district court's discretion to vary downwards for aberrant behavior is not constrained by the limitations of §5k2.20. *See United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) ("We see no reason why the district court's discretionary consideration of the aberrant nature of Defendant's conduct, for purposes of a downward variance, could not focus on the extent to which the criminal conduct was out of character for him, rather than on the factors that would be applicable for a Section 5K2.20 departure.").

In *DeRusse*, the Tenth Circuit rejected the government's appeal of a sentence for departing under 5K2.20 and varying downward for aberrant behavior,  finding "no reason why a variance

based on the district court's discretionary authority should be constrained by any of the specific requirements listed in a guideline that plays no role in the variance itself" and concluding that "the district court did not need to consider the other requirements that would be applicable for a Section 5K2.20 downward departure in order to conclude that Defendant's conduct was aberrant for purposes of a § 3553(a) downward variance." *Id.* at 1237. It dismissed the government's objections to the §5k2.20 departure as harmless error, if any, and affirmed a variance from an advisory guideline range of 108-135 months to a sentence of time served, 70 days. *Id.* at 1238.

Nor is the district court in *De* Russe, and the Tenth Circuit in affirming the sentence, alone. Perhaps most analogous, in *Gupta* the district court was faced with sentencing a defendant convicted at a jury trial of one count of conspiracy and three counts of substantive securities fraud with an attributed illegal gain of over $5million, and an offense level of 28, which, combined with 0 criminal history points, resulted in a guideline range of 78 to 97 months. *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014). Probation declined to recommend a departure for aberrant behavior but stated that "[w]e believe the defendant's commission of the instant offenses was aberrant behavior—not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined by Merriam–Webster: '... atypical.'" *Id.* at 354. The District Court agreed and found that "the aberrant nature of [the defendant's] conduct by itself would warrant a non-guideline sentence, even aside from the other factors favoring leniency," and ultimately issued a below guideline sentence of 24 months. *Id.* 354-55.

As the character letters attached attest, outside of the conduct at issue in this offense, Mr. Hampton has lived an upstanding and law-abiding life. He helps support his brother with his struggles with addiction. He helps support his wife with her mental health issues. He works hard and shows a demonstrated commitment to service and family. Mr. Hampton poses virtually no risk of criminal recidivism, and the instant offense was the definition of aberrant—arguably under the Guidelines, but inarguably under the Merriam-Webster dictionary. The Court should sentence him accordingly and depart or vary downward in its discretion on this basis.

### THE 3553(a) FACTORS STRONLGY SUPPORT A DOWNWARD VARIANCE

### I.   History and Characteristics of the Defendant

Mr. Hampton is part of a large, loving family with deep roots in the Philadelphia community. He grew up in a home that prioritized family, hard work, faith and service to others. His father Mark Hampton spent his career working in the train yards and his mother Denise

Hampton was an aide at a local school. While they worked hard, they found time to care for each other and instilled the values of discipline, forgiveness and service in their children. Shane's older brother struggled for years with drug addiction and the family endured many traumatic episodes as a result. Unfortunately, in his mid-20s, Mr. Hampton began to regularly use marijuana to help alleviate stress and help him sleep. Mr. Hampton acknowledges this was a poor and self-destructive decision, especially considering his family history of substance abuse and addiction. Despite his own struggles, Mr. Hampton served as an unfailing source of support for his brother and continues to offer him "his time, resources and most importantly love." *See* Ltr. of Gregory Hampton.

From an early age, Mr. Hampton, a gifted student who excelled in school, used his talents and kindness to help others. When Mr. Hampton was only 13 years old, he helped to re-design the layout and architecture for an outdoor staircase at Fox Chase Farm in Philadelphia. At Central High School, he volunteered as a peer tutor after school and during lunch breaks to help teach fellow students who were struggling with math and science. He also dedicated countless hours at the afterschool program at Northeast Community Center in Philadelphia, helping kids with homework and recreational activities.

Mr. Hampton's father noted that throughout his school years, Mr. Hampton's teachers "commented on Shane's respectful attitude and willingness to help others. They all said what a well-rounded, intelligent, and courteous student he was and what a joy he was to have in their class." Mr. Hampton's father found it astounding that Mr. Hampton "never got into trouble. He always made good decisions and made the right choices." Mr. Hampton's childhood friend, Antonio Benjamin, highlighted the characteristics that make Mr. Hampton extraordinary, including "his belief in people's potential," his "kindness and loyalty," his "selflessness" and his willingness to "have tough conversations" and be honest with others.

While attending Villanova University, Mr. Hampton participated in religious activities and took numerous theology courses, which helped him stay grounded and gain a deeper understanding of his faith. He also worked as an Athletic Facilities Attendant and was heavily involved in the athletics programs on campus; he played intramural basketball and intramural soccer for four years and. And he hosted a sports radio show called The Bottom Line on the student radio network (WXVU). He surrounded himself with a group of friends who shared his values, including his passion for learning, and appreciated his quiet, thoughtful demeanor. His college classmate Peter

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ WWW.GSGPA.COM

Lucas noted that Mr. Hampton "was the quiet and reserved member" of their friend group, "often acting as the sensible voice of reason, settling disputes without becoming emotional."

After college, Mr. Hampton met his now wife, Kerri Ann McEnroe. After an extensive period of dating long distance, they married in 2021 in Villanova, Pennsylvania. As attested to in many of the letters submitted to the Court, Mr. Hampton and Kerri's deep love for each other has touched those who know them. In her letter to the Court, Kerri noted that Mr. Hampton's "tenderness and patience ha[ve] been essential to [her] mental health journey." Kerri disclosed a history of debilitating mental health conditions to include generalized anxiety disorder, major depressive disorder, attention deficit hyperactivity disorder, obsessive-compulsive disorder, and trichotillomania, a chronic hair pulling and breaking disorder. Through his "love, tolerance, and understanding" Mr. Hampton has become "a tether to [Kerri's] emotional stability." Even during this extraordinarily stressful time, Mr. Hampton has prioritized Kerri's health and helped her manage her symptoms.

Mr. Hampton has displayed generosity and kindness throughout his life. Indeed, the numerous character letters describe Mr. Hampton as honest, reliable, trustworthy, principled, hard-working, devoted, respectful, considerate, and more. Shane's uncle, Keith DoSantos, recalled how Mr. Hampton would often engage in daily acts of kindness, like shoveling snow from the driveway of Mr. DosSantos's neighbor Millie, an elderly widow, and "refusing to accept her offer of payment." Gerard McEnroe, Mr. Hampton's wife's uncle, also described Mr. Hampton as "extremely outgoing and caring towards Kerri's brother, Timothy, who has autism" and noted that "the various acts of kindness Shane has shown to Timothy, and our entire family, are too numerous to list and have been greatly appreciated by all who have witnessed them." Mr. Hampton's father-in-law Gregory McEnroe also described Mr. Hampton in glowing terms, noting that he "has always treated Tim with kindness, patience and understanding" and that Shane seemed to have the "sixth sense" that allows others to connect with autistic individuals. Kerri's mother, Margaret McEnroe, has entrusted Mr. Hampton and Kerri to be Tim's guardians if she and Mr. McEnroe were unable to care for Tim. To her "[i]t is inconceivable that we would have to explain to Tim why Shane was taken from his life" because Mr. Hampton is such a crucial part of Tim's life.

Mr. Hampton's approach to his job search was similarly thoughtful. As his college roommate, Matt Roberts, noted in his letter, while "most people including myself were unsure of their priorities and therefore stressed themselves out to find the most flashy, prestigious, or

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ WWW.GSGPA.COM

lucrative opportunity." Mr. Hampton "was instead simply focused on finding an opportunity that he found to be intellectually interesting, which he found in a small start-up that was taking a new and analytical approach to wealth management and was founded by alumni of his high school." That startup was Hedgeable, Inc. ("Hedgeable"), which later became Hydrogen Technology Inc. ("Hydrogen"). As the testimony of Laurence Brouillet revealed, while at the company, Mr. Hampton worked hard and displayed generosity and kindness towards his colleagues.

Immediately after Mr. Hampton lost his employment with Hydrogen, he was hired by a technology startup named Jawnt, as a software engineer. Jawnt is not a non-profit or a charity, but it is a mission-oriented company. Its mission is to increase economic access to public transit systems, help reduce carbon emissions by decreasing the number of private vehicles on the road and use technology to improve how cities work. This is the primary reason why Mr. Hampton chose to join Jawnt. He was aligned with the mission, and it was a very distinct and genuine choice he made in his career progression. Notably, Mr. Hampton took a pay cut to follow that path. Unfortunately, he was terminated from Jawnt following his indictment in the instant case.

Recently, Mr. Hampton obtained a seasonal job at a wholesale grower of starter plants so he can expand his knowledge of horticulture. He and Kerri have a shared dream of starting a vertical farm to provide fruits and vegetables to food deserts.

Mr. Hampton's personal history and characteristics reveal that for almost the entirety of his life, he lived up to the values that his family instilled in him. He cared for and provided for his family; he worked hard and achieved academic excellence; he was kind and generous. The criminal conduct charged represents an aberration of an otherwise good and decent person. It is conduct for which Mr. Hampton has already paid and will continue to pay a heavy price for the rest of life. This Court, however, should consider Mr. Hampton's full history and characteristics in determining an appropriate sentence for him. Indeed, "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 Fed. App'x. 93 (2d Cir. 2008).

If Mr. Hampton were sentenced to a period of incarceration, he would be unable to care for the many people who rely on him for their mental and physical health, including his mother, who

suffers from Parkinson's disease. This is a devastating consequence and one which also merits consideration for a lesser sentence under 18 U.S.C. § 3553(a).

## II. Offense Conduct

Mr. Hampton is a 32-year-old software engineer whose criminal conviction stems from his work at Hydrogen, a financial technology company that was an offshoot of Hedgeable, where Mr. first worked upon graduating college. Mr. Hampton, a graduate of Villanova with honors, could have opted for a lucrative job, but was attracted to Hedgeable because he believed in the company and "genuinely wanted to be the type of hard-working man that his wife and future children could be proud of, that his entire family could be proud of." *See* Ltr. of Amanda DosSantos.

Mr. Hampton's colleague at the company, Siddhartha Sharma, described him as "a very smart, bright young man who wanted to convert his knowledge in finance at school to helping millions of Americans get access to low cost, sophisticated and automated investment management services." *See* Ltr. of Sid Sharma. As a software engineer, Mr. Hampton used his skills to develop the software that allowed financial institutions to use the Hedgeable platform to help individuals invest in the right kind of assets for their profile.

Mr. Hampton's hard work and excellent rapport with colleagues led to his promotion to the position of Head of Financial Engineering, where he oversaw other software engineers who also worked on developing the Hedgeable platform. In late 2017, the founders of Hedgeable, Michael Kane and Matt Kane, created Hydrogen and soon thereafter began creating a public open-source blockchain with the goal of creating an ecosystem where developers would build applications ("apps") that could carry out operations using the blockchain. In February 2018, Hydrogen issued a cryptocurrency called HYDRO that could operate on the public blockchain.

Mr. Hampton, who was largely consumed by his work on the investment platform side, volunteered to assist with the development of HYDRO because he was interested in the idea of a cryptocurrency that could have utility and open up a new world of investment possibilities. It was Mr. Hampton's decision to get involved with the blockchain side of the business that led him to the unfortunate situation in which he finds himself today.

Hydrogen first released HYDRO through an airdrop process, giving away HYDRO for free to more than 10,000 developers in the hopes that those developers would create applications that used HYDRO. Mr. Hampton received 2.5% of the HYDRO tokens, the same amount as the Head

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

of Blockchain Engineering, Andy Chorlian, and one fifth of the amount of tokens retained by each of the Kane brothers.

As the trial testimony and evidence demonstrated, Mr. Hampton's boss, Mr. Kane, directed Mr. Hampton to find a market maker to help Hydrogen sell HYDRO on the secondary market. Mr. Hampton complied and worked in concert with Mr. Chorlian and Mr. Kane to find a legitimate market maker. Together, they identified and researched approximately 17 potential market makers. After a few more weeks had passed, under time pressure from Mr. Kane, following a recommendation from Mr. Chorlian and a meeting with the President and CEO of a market making company called Moonwalkers, Mr. Hampton signed a contract, on behalf of Hydrogen, with Moonwalkers, a market making company who would also sell HYDRO on the secondary market.

After being hired to commence their work on October 9, 2018 and continuing until the second contract ended on April 11, 2019, Moonwalkers engaged in market manipulation tactics such as spoof trading and wash trading. During that period of time, Moonwalkers and Hydrogen had an ongoing Slack chat where Moonwalkers largely reported on their activities to Hydrogen. Mr. Hampton was a member of that chat and executed some of the monthly payments to Moonwalkers. Moonwalkers' manipulation artificially increased the volume of HYDRO and enabled Hydrogen to sell more of their tokens on the secondary market.

The nature of the offense demonstrates that Mr. Hampton devoted his professional career to growing and developing a company in which he believed; it reveals that the conduct for which he was convicted is only a small part of a much bigger story, one in which Mr. Hampton sought to innovate and do right, but somewhere along the way, things went astray. Importantly, this is not the story of an individual who was driven by greed, profit and a desire to benefit at the expense of others. Indeed, Mr. Hampton regrets that what started as a project full of hope, progress and innovation ended with disappointment, manipulation and loss.

## III. Proportionality Among the Sentences of Co-Conspirators and Avoidance of Gross Disparity in Sentencing

18 U.S.C. § 3553(a)(6) requires courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" in fashioning sentences. This memorandum has already discussed at length the topic of comparative punishment related to the individuals charged in the Hydrogen/Moonwalkers conduct. Next, is a discussion of comparative punishment of defendants who have been found

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ WWW.GSGPA.COM

guilty of similar conduct. Several cases in the United States have involved defendants in similar circumstances. Those cases have typically been resolved through civil enforcement proceedings, probationary sentences, and sentences well below the sentencing guideline range.

The sentences of two co-conspirators out of the Southern District of Florida are illustrative of the large disparity that would be created by a guideline sentence for Mr. Hampton. In *United States v. Ruderman*, 23-CR-20303-CMA, one of the defendants was the chairman of a lending business, which offered investment opportunities. In 2016, after receiving advice that his company's offering was a security, the defendant instructed his co-conspirator, a lawyer, to author a letter advising that his company's offering was not a security. The defendant doubled down on the lie a second time after receiving additional legal advice that it was a security. The defendant promised investors 18% 20% returns and created false portfolio statements inflating his part returns on investments. The defendant also falsely represented to investors that his company had been audited by two certified public accounting firms. Through these lies, and more, the defendant was able to obtain millions in investment money. Rather than invest his client's money as requested, he used the funds for his credit card payments, vacation, travel, insurance payments for an art collection and valuable jewelry, drivers, nannies, housekeepers, mortgage payments for his house, tuition, and payments for a luxury car driven by his wife. All in all, the defendant diverted approximately $35,000,000 to his own benefit, caused substantial financial hardship on more than 25 individuals, and owed $142,239,265 in restitution. Judge Altonaga sentenced him to 60 months followed by 3 years of supervised release.

In *United States v. Alan Heide*, 19-cr-60231-RKA the defendant was sentenced following a plea agreement related to the same conspiracy described in *Ruderman*. During the sentencing hearing, the Court calculated his total offense level as 37, based on a $65 to $120 million loss range, substantial hardship on 25 or more victims, using sophisticated means, abusing a position of trust, and acceptance of responsibility. [ECF No. 50, 19-cr-60231-RKA]. Judge Roy Altman sentenced him to 60 months and three years of supervised release. He was also ordered to pay $57,671,799.29 in restitution.

Several other cases from outside the district are also instructive. *In United States v. Cervino*, 15-CR-171 (S.D.N.Y) the defendant was convicted of fraud following a three-week trial. The defendant recruited others into the scheme, caused a loss of at least $3.7 million, and had an overall

guideline calculation of 31 [ECF No. 375]. The Court sentenced the defendant to one year and one day, followed by three years of supervised [ECF No. 367].

In *United States v. Bhardwaj, et al.*, 22 CR 0398-GHW (SDNY), the lead defendant was an executive and was sentenced to 24 months in prison, fined $975,000 ($75,000 per count of conviction), and ordered to forfeit $547,000 for insider trading that generated $5.2 million of profit. Like the present case, the Bhardwaj prosecution followed an SEC enforcement action and the Guidelines range for the lead defendant espoused by Probation was significantly higher than the sentence he received. Two co-defendants in that case were respectively sentenced to 18 months' incarceration, with a fine of $75,000 and a forfeiture order of $2.5 million, and five months in prison, with an additional seven months' home detention, a fine of $75,000 and forfeiture of $691,000. Those co-defendants similarly faced markedly higher Guidelines ranges. Unlike the instant matter, however, those defendants all personally profited and caused losses (and had gross gains) much greater than can be attributed to Mr. Hampton, even under the government's theory.

Similarly in *United States v. Cole*, 19-CR-0869-ER (S.D.N.Y) the defendant was convicted after trial of eight counts related to securities fraud, relating to falsified records depicting $11 million in revenue to his company, requiring a $800,000 forfeiture. The Court found that the defendant obstructed justice by testifying, was an officer of a public company, was a manager or supervisor, and inflicted a loss greater than $550,000.00, and calculated a total offense level of 30. The Court decreased the level by two points because he had no criminal history points and qualified for the reduction. Although the defendant's Guideline range was 78 to 97 months, the Court sentenced him to 18 months followed by supervised release.

Perhaps most analogously, in *United States v. James Vorley and Cedric Chanu*, 18-cr-00035 (ND. Ill.), the defendants were employed as traders at Deutsche Bank AG and were convicted after trial of engaging in a years-long conspiracy to defraud other traders on the Commodity Exchange Inc. The defendants and their co-conspirators defrauded other traders by placing fraudulent orders that they did not intend to execute to create the appearance of false supply and demand and to induce other traders to trade at prices, quantities, and times that they otherwise would not have traded. The defendants and their co-conspirators placed such fraudulent and manipulative orders by themselves and in coordination with other traders at Deutsche Bank AG,

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ WWW.GSGPA.COM

including each other, and were attributed a loss of $1.2 million. [ECF No. 383 at 13]. Both defendants were sentenced to a term of imprisonment of 1 year and 1 day. [ECF No. 406].

It also must be noted that frequently criminal charges are not brought in securities fraud cases involving much larger schemes with greater gains, and are instead resolved civilly, even in the presence of criminal conduct. *See, e.g. In SEC v. O'Brien*, No. 21-cv-9575 (S.D.N.Y.) (charging a five year security fraud involving the creation of a false appearance of sell-interest and resulting in a a net profit over $6million, and resolving civilly for disgorgement, a civil penalty, and a permanent injunction); *SEC v. Lek Securities Corp.*, et al., No. 17-cv-1789 (S.D.N.Y.) (charging a scheme involving spoof trades resulting in illicit profits of over $21million, and resolving civilly for disgorgement, a civil penalty, and an injunction against one defendant, and prevailing against the other defendant at a civil trial and winning a judgment for $4,627,314).

These cases illustrate that, to avoid a sentencing disparity, a sentence substantially lower than the calculated Guidelines range is appropriate.

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ www.gsgpa.com

**CONCLUSION**

The PSI recommends an *advisory* guideline range of 97 to 121 months.  Objections have been filed and we believe the *advisory* guideline range is 37 to 46 months. There are also substantial grounds for a downward departure and variance and for a recommendation for participation in the Bureau of Prison's Residential Drug Abuse Program (RDAP).

For all the reasons set forth in this Sentencing Memorandum, a sentence substantially below the revised advisory Guidelines range would adequately punish Shane and serve all the goals and objectives of federal sentencing.


Dated:  June 21, 2024                    Respectfully Submitted,

                                         */s/ Barbara R. Llanes*
                                         BARBARA LLANES
                                         Florida Bar No. 1032727
                                         bllanes@gsgpa.com
                                         CHRISTOPHER S. SUNDBY
                                         Florida Bar No. 1026060
                                         csundby@gsgpa.com
                                         DANIEL R. WALSH
                                         Florida Bar No. 0124282
                                         dwalsh@gsgpa.com
                                         GELBER SCHACHTER & GREENBERG, P.A.
                                         One Southeast Third Avenue, Suite 2600
                                         Miami, Florida 33131
                                         Telephone: (305) 728-0950
                                         E-service: efilings@gsgpa.com

                                         *Counsel for Defendant Shane Hampton*

GELBER SCHACHTER & GREENBERG, P.A.
ONE SOUTHEAST THIRD AVENUE ▪ SUITE 2600 ▪ MIAMI, FLORIDA 33131 ▪ WWW.GSGPA.COM